Filed 12/16/21

CERTIFIED FOR PARTIAL PUBLICATION[*]

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| SAVE CIVITA BECAUSE SUDBERRY WON'T, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SAN DIEGO, <br><br> Defendant and Respondent. | D077591 <br><br><br> (Super. Ct. No. 37-2017-00045044-CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge. Affirmed.

Briggs Law Corporation, Cory J. Briggs and Janna M. Ferraro for Plaintiff and Appellant.

Mara W. Elliott, City Attorney, George F. Schaefer, Assistant City Attorney, and Lynn M. Beekman and Benjamin P. Syz, Deputy City Attorneys, for Defendant and Respondent.

---

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.A.2, III.A.3, III.A.4, and III.B.

I.

INTRODUCTION

The City of San Diego (City) certified an environmental impact report (EIR) for the "Serra Mesa Community Plan [SMCP] Amendment Roadway Connection Project" (Project) and approved an amendment to the SMCP and the City's General Plan to reflect the proposed roadway.[1] The proposed four-lane major road—together with a median, bicycle lanes, and pedestrian pathways—would run in a north/south direction between Phyllis Place in Serra Mesa to Via Alta / Franklin Ridge Road in Mission Valley.[2] Via Alta and Franklin Ridge Road are contained within Civita, a partially built out mixed-use development that the City approved in 2008.[3]

Save Civita Because Sudberry Won't ("Save Civita") filed a combined petition for writ of mandate and complaint for declaratory and injunctive relief (Petition / Complaint) against the City, challenging the City's certification of the EIR and approval of the Project.[4] In its Petition /

---

[1] The resolution approving the amendment noted that it "reconciles a conflict between the Serra Mesa and Mission Valley community plans because the Mission Valley Community Plan [MVCP] includes the street connection but the current version of [SMCP] does not." The resolution also stated that the amendment to the City's General Plan was required "due to the [SMCP] being part of the Land Use Element of the 2008 General Plan."

[2] When depicted on a map, the proposed roadway forms an upside-down "Y"-shaped intersection at Phyllis Place, Via Alta, and Franklin Ridge Road. (See Appendix A, *post*.)

[3] Civita was initially named "Quarry Falls." For purposes of clarity, we refer to the development as Civita throughout this opinion.

[4] According to the Petition / Complaint, Save Civita "is a non-profit organization," that has "[a]t least one . . . member[ ] [who] resides in, or near,

Complaint and briefing, Save Civita contended that the City violated the California Environmental Quality Act ("CEQA") (Pub. Resources Code, § 21000 et seq.),[5] the Planning and Zoning Law (Gov. Code, § 65000 et seq.), and the public's due-process and fair-hearing rights.[6] The trial court denied the Petition / Complaint in its entirety and entered a judgment in favor of the City.

On appeal, Save Civita raises four claims related to the City's certification of the EIR for the Project. First, Save Civita claims that the City violated Guidelines section 15088.5, subdivision (g)[7] in failing to summarize revisions made in the Project's recirculated draft EIR (RE-DEIR). Save Civita also claims that the Project's final EIR (FEIR) was deficient because it failed to adequately analyze, as an alternative to the Project, a proposal to amend the MVCP to remove the planned road from that community plan. Save Civita further contends that the FEIR is deficient because it failed to adequately analyze the Project's traffic impacts. Specifically, Save Civita maintains that the FEIR failed to disclose the true margin of error associated

---

the Serra Mesa community of [the] City of San Diego, California, and [that] has an interest in, among other things, ensuring open, accountable, and responsive government and in protecting Serra Mesa's quality of life."

The administrative record indicates that Sudberry Properties is an entity associated with Civita's developer.

[5] Unless otherwise indicated, all subsequent statutory references are to the Public and Resources Code.

[6] Specifically, Save Civita raised its CEQA and Planning and Zoning Law claims in the Petition / Complaint, and asserted its procedural due process claim in a supporting brief.

[7] References to "Guidelines," are to the administrative guidelines for the implementation of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

3

with a traffic projection in the FEIR and "ignored obvious traffic hazards," (capitalization and boldface omitted) that the Project would create on Via Alta and Franklin Ridge Road. Save Civita also claims that the FEIR failed to adequately discuss the Project's inconsistency with the General Plan's goal of creating pedestrian-friendly communities.

In addition to its EIR / CEQA claims, Save Civita maintains that the Project will have a deleterious effect on the pedestrian-friendly Civita community and that the City therefore violated the Planning and Zoning law in concluding that the Project is consistent with the City's General Plan. Finally, Save Civita maintains that the City acted in a quasi-adjudicatory capacity in certifying the FEIR and approving the Project and that a City Council member violated the public's procedural due process rights by improperly advocating for the Project prior to its approval.

In a published section of this opinion we conclude that the City did not violate Guidelines section 15088.5, subdivision (g) in failing to summarize revisions made to the Project's previously circulated programmatic draft EIR (PDEIR) in the RE-DEIR. (See pt. III.A.1, *post*.) In a second published section, we conclude that the City Council acted in a quasi-legislative capacity in certifying the FEIR and approving the Project, and that this determination forecloses Save Civita's procedural due process claim. (See pt. III.C, *post*.) In unpublished sections of this opinion, we reject the remainder of Save Civita's contentions. We affirm the trial court's judgment in favor of the City in its entirety.

4

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Civita*

    1. *The Civita development*

In 2005, Civita's developer sought approvals from the City to develop a large mixed-use development in Mission Valley that would contain residences, public recreational spaces, open lands, and retail and office space.

The FEIR[8] described the Civita development in part as follows:

> "[The Civita] site encompasses approximately 225 acres immediately south of Phyllis Place. The [Civita development] includes . . . a mixed-use, walkable community including residential, commercial, and parks and open space development."

The FEIR also described Civita in part as follows:

> "The [Civita EIR] stated that the proposed project would include a development cap that would prohibit the project from exceeding 4,780 residential units, 603,000 square feet of retail space, and 620,000 square feet of office/business park uses. The [Civita development] would also include 31.8 acres of public and private parks, civic uses, open space and trails, and an optional school site. Construction of . . . the southwestern portion of the site has been completed. Land uses within this area include currently occupied residences."

The Civita development is located primarily within the MVCP area, bordered on the south by Friars Road, on the north by Phyllis Place (within the SMCP area), on the east by interstate I-805, and on the west by Mission Center Road.

---

8    The Civita development was subject to a separate EIR, which we refer to as the Civita EIR.

2. *The Civita EIR's analysis of a potential road connection between Phyllis Place and Via Alta / Franklin Ridge Road*

The Civita EIR analyzed a potential road connection from Phyllis Place to Via Alta / Franklin Ridge Road. Specifically, Alternative 4 of the Civita EIR—"Road Connection to Phyllis Place"—provided an analysis of the potential environmental impacts of the road connection. The analysis included tables describing projected traffic conditions with and without the proposed connection, which the Civita EIR summarized as follows:

> "As shown in [various tables], project traffic under this alternative would impact roadway segments and intersections similar to the proposed project. However, due to the different distribution of traffic associated with the Phyllis Place connection, traffic impacts under this alternative would occur at different locations; in other locations, impacts would be avoided. Although significant impacts are comparable, in general the redistribution of traffic to the Phyllis Place / I-805 interchange is beneficial to existing Mission Valley circulation streets where total vehicular trips are reduced, such as for Friars Road between SR-163 and I-15; Mission Center Road from Friars Road to I-8; and Qualcomm Way from Friars Road to I-8."

3. *The City Council's approval of the Civita development and its direction to analyze a community plan amendment showing the road connection*

In October 2008, the City Council approved the Civita development. As part of its approval, the City Council adopted a resolution (R-304297), directing staff to analyze an amendment to the SMCP and the City's General Plan to include a street connection between Phyllis Place and Friars Road.[9] The resolution provided in relevant part:

---

9    Friars Road is a road located to the south of the Project that runs east and west. (See Appendix A, *post*.)

6

> "Council directs staff to analyze the following issues in relation to the aforementioned street connection and land use plan amendments:
>
> "1. Whether police and fire response times would be improved with the road connection.
>
> "2. Whether the road connection could serve as an emergency evacuation route.
>
> "3. Whether it is feasible to make the road available for emergency access only.
>
> "4. Whether pedestrian and bicycle access would be improved by the street connection."

B. *The Project*

1. *The PDEIR*

In April 2016, the City issued the PDEIR. The PDEIR indicated that the Project was the adoption of an amendment "to the [SMCP] . . . to include a street connection from Phyllis Place in Serra Mesa southward to the [Civita] Specific Plan area in Mission Valley."

2. *The RE-DEIR*

The City issued the RE-DEIR in March 2017. As discussed in greater detail in part III.A.1, *post*, the City provided the following explanation for its decision to recirculate an EIR:

> "In light of the public comments received during public review of the [PDEIR], the construction of the roadway connection was determined to be foreseeable; therefore, a project-level analysis[10] was conducted and included within the [RE-DEIR]. Further evaluation of the subsequent actions necessary to implement and construct the roadway connection was completed.

10    We discuss the distinction between a programmatic EIR and a project-level EIR in part III.A.1.c.i, *post*.

7

"This revised and recirculated [RE-DEIR] analyzes impacts at a project level to ensure that all potential significant environmental effects associated with the [P]roject are disclosed."

3. *The FEIR*

In August 2017, the City issued the FEIR for the Project. The FEIR describes the Project as follows:

"The proposed [P]roject consists of construction and operation of a four-lane major street, complete with bicycle lanes and pedestrian pathways, extending from Phyllis Place in Serra Mesa southward to Via Alta and Franklin Ridge Road in Mission Valley [citation].

"The proposed [P]roject would require an amendment to the [SMCP]. This amendment would require map and text changes to the plan to include the roadway connection as a four-lane major street and revise the Street Classification and the Bikeways and Pedestrian Walkway figures in the currently adopted [SMCP]."

4. *Public review of the Project*

The FEIR contains more than a hundred separate letters from the public commenting on the RE-DEIR. The comments, and the City's responses, span nearly a thousand pages in the administrative record.

In addition to these comments and responses in the FEIR, two community planning groups reviewed the Project. In May of 2017, the Serra Mesa Community Planning Group (SMPG) voted unanimously to recommend denial of the Project. That same month, the Mission Valley Planning Group heard the item as an "informational item," but took no action on the item.

The City also held several public hearings on the Project. In August 2017, the City's Planning Commission held a public hearing and voted unanimously, with one member recusing, to recommend approval of the

8

Project and certification of the FEIR. The following month, the City Council's Smart Growth & Land Use Committee held a public hearing and voted unanimously to recommend approval of the Project to the full City Council.

5. *The City's certification of the FEIR and its approval of amendments to the SMCP and the City's General Plan*

The City Council held a public hearing on the Project in October 2017. At the conclusion of the hearing, the City Council adopted two resolutions.[11] One of the resolutions (R-311380) certified the FEIR and made related findings from the FEIR; adopted a statement of overriding considerations under CEQA for the Project; and adopted a mitigation, monitoring, and reporting program for the Project. The second resolution (R-311381) adopted an amendment to the SMCP and the City's General Plan to "identify a roadway connection from Phyllis Place in Serra Mesa southward to the boundary between the Serra Mesa and Mission Valley community planning areas."

C. *Procedural background*

1. *Save Civita's Petition / Complaint*

In November 2017, Save Civita filed its Petition / Complaint. In a single cause of action styled as "Illegal Approval and Adoption of Project," Save Civita claimed that the City had violated CEQA (§ 21000 et seq.) in several ways, including by failing to "provide adequate identification and analysis of the significant adverse environmental impacts, [and a] reasonable range of alternatives . . . ."

In this same cause of action, Save Civita further alleged that the City violated the Planning and Zoning Law (Gov. Code, § 65000 et seq.) in

---

[11] Both resolutions were adopted with eight votes in favor and one vote against.

9

approving the Project because, according to Save Civita, the Project was not consistent with "the applicable general and specific plans and their components."

In its prayer for relief, Save Civita sought various forms of relief, including a declaratory judgment stating that the City had failed to comply with applicable laws and injunctive relief prohibiting the City from taking any action to implement the Project without complying with all applicable laws.

2. *Save Civita's supporting brief*

Save Civita filed a brief in support of its Petition / Complaint. In its brief, Save Civita maintained that the City had violated CEQA in four ways: (1) the City failed to summarize revisions made to the previously circulated PDEIR in the RE-DEIR; (2) the FEIR failed to adequately analyze a reasonable range of alternatives; (3) the FEIR failed to analyze the Project's traffic impacts; (4) and the FEIR failed to analyze the Project's inconsistency with relevant land use plans.

In its brief, Save Civita also maintained that the City violated the Planning and Zoning Law in approving the Project. In support of this contention, Save Civita argued that the Project was inconsistent with the City of Villages strategy contained within the City's General Plan in that the Project was "neither pedestrian-friendly nor likely to reduce greenhouse-gas emissions."

Finally, Save Civita contended that the City had violated the public's right to due process and a fair hearing. In support of this claim, Save Civita asserted that "at least one City Council member had become a cheerleader for the Project [and had] decided he was going to approve the Project long before any evidence was presented to the City Council."

10

### 3. *The City's opposition*

The City filed an opposition brief to Save Civita's Petition / Complaint that addressed each of Save Civita's arguments and contended that it had not violated CEQA, the Planning and Zoning Law, or the public's right to due process and a fair hearing.

### 4. *The administrative record*

With its opposition, the City certified the voluminous administrative record, which consists of approximately 41,040 pages.

The City also lodged salient portions of the administrative record, including the following documents: resolutions from the City Council pertaining to the approval of the Civita development in 2008 and the City Council's approval of the Project in 2017; excerpts of the final EIR for the Civita development; the FEIR; an August 2017 memorandum for the City's Planning Department to the City Council recommending approval of the Project; images from a Planning Department presentation on the Project to the City Council; minutes from the City Council meeting approving the Project; excerpts from the transcript of the City Council meeting approving the Project; excerpts from the City's Street Design Manual; excerpts of traffic studies analyzing the Project; an August 2017 memorandum for the City's Planning Department to the City's Planning Commission recommending approval of the Project; an August 2017 letter from the State of California Department of Transportation expressing agreement with the "analysis and mitigation" contained in the RE-DEIR; excerpts from the transcript of the August 2017 City Planning Commission meeting on the Project; a 2012 notice of an EIR scoping meeting for the Project; excerpts from various land use planning and policy documents, including the City's General Plan; an e-mail related to the Project's "vehicle miles traveled" analysis contained in the

11

FEIR; excerpts from a memorandum to the City Council pertaining to the Civita development; excerpts and notices from both the PDEIR and the RE-DEIR; and excerpts of a 2007 traffic impact study for the Civita development.

5. *The trial court's ruling*

The trial court issued a tentative ruling denying Save Civita's Petition / Complaint in its entirety. After a hearing, the trial court issued an order clarifying and confirming its tentative ruling in favor of the City.

In February 2020, the trial court entered a judgment in favor of the City.

6. *The appeal*

Save Civita timely appeals from the judgment.

III.

DISCUSSION

A. *Neither the RE-DEIR nor the FEIR violated CEQA*

Save Civita raises four claims related to the City's certification of an EIR for the Project. We consider each claim below.

1. *The City did not violate Guidelines section 15088.5, subdivision (g) in failing to summarize revisions made to the previously circulated PDEIR, in the RE-DEIR*

Save Civita claims that the City violated Guidelines 15088.5, subdivision (g) in failing to summarize revisions made to the previously circulated PDEIR, in the RE-DEIR.

a. *Relevant law*

i. *Guidelines section 15088.5*

Guidelines section 15088.5 outlines the circumstances *when* a lead agency is required to recirculate an EIR (Guidelines, § 15088.5, subds. (a)–(b), (e)), and describes *how* such recirculation is to occur (Guidelines, § 15088.5, subds. (c), (f), (g).)

12

Guidelines section 15088.5, subdivision (a) provides in relevant part:

> "A lead agency is required to recirculate an EIR when significant new information is added to the EIR after public notice is given of the availability of the draft EIR for public review . . . but before certification. As used in this section, the term 'information' can include changes in the project or environmental setting as well as additional data or other information."[12]

Guidelines section 15088.5, subdivision (f) pertains to the manner by which a lead agency shall evaluate and respond to comments when an EIR is recirculated. Guidelines section 15088.5, subdivision (f)(1) provides:

> "(1) When an EIR is substantially revised and the entire document is recirculated, the lead agency may require reviewers to submit new comments and, in such cases, need not respond to those comments received during the earlier circulation period. The lead agency shall advise reviewers, either in the text of the revised EIR or by an attachment to the revised EIR, that although part of the administrative record, the previous comments do not require a written response in the final EIR, and that new comments must be submitted for the revised EIR. The lead agency need only respond to those comments submitted in response to the recirculated revised EIR."

Guidelines section 15088.5, subdivision (g) requires the lead agency to summarize the revisions made to a previously circulated draft EIR. The subdivision provides:

---

12    (Accord, § 21092.1 ["When significant new information is added to an environmental impact report after notice has been given . . . and consultation has occurred . . . , but prior to certification, the public agency shall give notice again . . . , and consult again . . . before certifying the environmental impact report".)

13

"When recirculating a revised EIR, either in whole or in part,[13] the lead agency shall, in the revised EIR or by an attachment to the revised EIR, summarize the revisions made to the previously circulated draft EIR."

    ii.  *Case law*

Neither party has cited, and our own research has not uncovered, any case law interpreting or applying Guidelines section 15088.5, subdivision (g).

    b.  *Standard of review*

In *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502 (*Sierra Club*), the Supreme Court outlined the following principles concerning the standard of review to be applied to a claim that an EIR failed to perform its essential function of informing the public of issues raised by a proposed project:

"The ultimate inquiry, as case law and the CEQA guidelines make clear, is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation]; see *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* [(2001)] 91 Cal.App.4th [1344, 1356] ['Whether an EIR will be found in compliance with CEQA involves an evaluation of whether the discussion of environmental impacts reasonably sets forth sufficient information to foster informed public participation and to enable the decision makers to consider the environmental factors necessary to make a reasoned decision.']; Guidelines, § 15151 ['An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental

---

13    Guidelines section 15088.5, subdivision (c) provides, "If the revision is limited to a few chapters or portions of the EIR, the lead agency need only recirculate the chapters or portions that have been modified."

    Guidelines section 15088.5, subdivision (f)(2) specifies how a lead agency shall evaluate and respond to comments in the event that only portions of an EIR are recirculated.

consequences.'].) The inquiry presents a mixed question of law and fact. As such, it is generally subject to independent review. However, underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference. [Citations.] Thus, to the extent a mixed question requires a determination whether statutory criteria were satisfied, de novo review is appropriate; but to the extent factual questions predominate, a more deferential standard is warranted." (*Id*. at p. 516.)

We apply this standard of review to Save Civita's claim, reviewing de novo both the meaning of the summarization requirement contained in Guidelines section 15088.5, subdivision (g) and the question of whether the "statutory criteria were satisfied . . . ." (*Sierra Club, supra*, 6 Cal.5th at p. 516.)[14]

### c. *Factual and procedural background*

#### i. *The PDEIR and the RE-DEIR*

A chapter of the PDEIR titled "Project Description," stated that the proposed Project consisted of a "*community plan amendment to the [SMCP]* to include a street connection from Phyllis Place, located in Serra Mesa, southward to the boundary of Serra Mesa and Mission Valley." (Italics added.) However, this chapter of the PDEIR also made clear the limited scope of the proposed project, stating:

> "The City's action is *only* to amend the [SMCP]. The City is *not* proposing to construct or fund the roadway connection." (Italics added.)

In contrast, the "Project Description" chapter of the RE-DEIR states that the Project being analyzed consists of the *construction of the road itself*,

---

14    Neither party points to any disputed factual questions relevant to Save Civita's claim that the City violated section 15088.5, subdivision (g).

stating, "The proposed [P]roject consists of construction and operation of a four-lane major street, complete with bicycle lanes and pedestrian pathways, extending from Phyllis Place in Serra Mesa southward to Via Alta and Franklin Ridge Road in Mission Valley . . . ."

A section of the Project Description chapter of the RE-DEIR (section 3.2) explained the genesis of this change, noting that the PDEIR had examined an amendment to the SMCP at a " 'programmatic' level," and that "[a]fter considering the comments received during the public review period, the City decided to analyze the road-connection with a project-level analysis." (Compare Guidelines, §§ 15161 ["project" EIR], 15148 ["program" EIR].)[15] The Project Description stated further that revisions to the PDEIR caused the City to "*replace* the P[D]EIR with a project-level EIR and recirculate for a second public review."  (Italics added.)

_____

[15]    In *Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 605, this court noted that the Guidelines describe these two "different type[s]," of EIRs as follows:

> "[T]he Guidelines describe several types of EIRs, which may be tailored to different situations.  The most common is the project EIR, which examines the environmental impacts of a specific development project.  (Guidelines, § 15161.)  A quite different type is the program EIR, which 'may be prepared on a series of actions that can be characterized as one large project and are related either: (1) Geographically, (2) As logical parts in the chain of contemplated actions, (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways.' (Guidelines, § 15168, subd. (a); [citation].)"

The first page of the RE-DEIR is a Public Notice of Availability for Recirculation (the Notice), which also states that the PDEIR "has been revised to analyze impacts at a project level to ensure that all potential[ly] significant environmental effects associated with the [P]roject are disclosed, and further evaluation of the subsequent actions necessary to implement and construct the roadway connection is included." The Notice informed readers that comments on the PDEIR would not receive responses.[16]

The executive summary of the RE-DEIR reiterated that the EIR evaluated both "an amendment to the [SMCP]," *and* the "construction and operation of a four-lane major street, complete with bicycle lanes and pedestrian pathways, extending from Phyllis Place in Serra Mesa southward to Via Alta and Franklin Ridge Road in Mission Valley."

Chapter 4 of the RE-DEIR details the "History of Project Changes" stating:

> "The [PDEIR] analyzed the programmatic action of the amendment to include Franklin Ridge Road in the Circulation Element of the [SMCP]. [¶] In light of the public comments received during public review of the [PDEIR], the construction of the roadway connection was determined to be foreseeable; therefore, a project-level analysis was conducted and included within the recirculated [RE-DEIR]. Further evaluation of the subsequent actions necessary to implement and construct the roadway connection was completed."

ii. *The City states in the FEIR that it has complied with Guidelines section 15088.5, subdivision (g)*

In response to the City's issuance of the RE-DEIR, the SMPG sent the City a letter containing 212 separately analyzed comments. One of the comments specifically alleged that the City had failed to comply with the

---

16    Section 1.4 of the RE-DEIR reiterated these aspects of the Notice.

summarization requirement contained in Guidelines section 15088.5, subdivision (g). In the FEIR, the City responded to this comment in relevant part as follows:

> "The [RE-]DEIR complied with this requirement. A summary of the revisions made to the previously circulated [PD]EIR was provided in the Public Notice of Availability for Recirculation of an EIR and also within Chapter 3, *Project Description*: 'After considering the comments received during the public review period, the City decided to analyze the road connection with a project-level analysis. The additional description and analysis warranted revisions to the [PDEIR], which in turn led the City to decide to replace the [PDEIR] with a project-level EIR and recirculate for a second public review.' As the scope of analysis changed from a programmatic level (e.g., not including any specific roadway design, construction details) to a project level of analysis, the entire [PDEIR] necessarily warranted revisions throughout to reflect that detail. Furthermore, the [RE-]DEIR was in an entirely new format (e.g., font, numbering, figures) which would indicate that the entirety of the [PDEIR] had been revised."

An attorney representing the Serra Mesa Community Council reviewing the RE-DEIR also sent the City a letter asserting that the City had failed to comply with Guidelines section 15088.5, subdivision (g). The attorney stated the following:

> "Please identify, by providing either, or both: (a) a list of material changes in the [P]roject design and/or study, and (b) an interlineated and strike-out version of the [RE-]DEIR and its appendices so that the public, third party agencies, and decisionmakers know what to focus on during their second reading and comments such that meaningful comment can be provided. (CEQA Guidelines § 15088, subds. (f)(1), (g))." (Italics omitted.)

The City responded in part to this comment by stating:

18

"The commenter also requests that the City provide a list of material changes to the [P]roject design and/or study as well as a strike-out version of the [PD]EIR so that interested parties 'know what to focus on . . . such that meaningful comment can be provided.' To provide a strikeout version of the originally circulated [PD]EIR or a more detailed summary that contains what would amount to a long list of changes between versions would provide no additional meaningful information to the reader and decision-maker other than to support the statement already in the Public Notice and [PD]EIR that substantial revisions had occurred since the previously circulated draft. Moreover, in practical terms, if the document was provided in strikeout/underline format, as suggested, nearly the entire document would be shown as strikeout/underline. The result would be a recirculated [draft EIR] of limited informational value to the majority of readers because of its near illegible condition. In addition, because the entire [PD]EIR was completely overhauled, a summary statement indicating that the [PD]EIR was converted from a high level program analysis to a detailed project level analysis is a sufficient summary because it accurately conveys to the reader and decision-maker the significant changes that occurred since the previous review. Finally, the public review was 60 days, which is more than 15 days beyond the 45 days required by CEQA and which would provide more time than required by State law for the public to review the recirculated [RE-]DEIR in its entirety."

### iii.  *Save Civita's claim in the trial court*

Save Civita contended that the City had failed to comply with Guidelines section 15088.5, subdivision (g), arguing, "neither the [RE-]DEIR nor any attachment to it summarizes the revisions made." Save Civita contended that "[r]equiring members of the public to rifle through these two voluminous, technical documents to try and figure out the differences was an obstacle to informed discussion."

19

The City responded by contending that it had adequately summarized the changes to the PDEIR in the RE-DEIR, arguing that its "summarization is sufficient to appri[s]e the reader that this is an entirely different level of analysis and revisions are throughout."[17] The City also argued that "[n]o prejudice ha[d] been shown," from any insufficiency in the RE-DEIR's summary of changes because "public comment was vigorous."

The trial court issued a tentative ruling stating that the City "arguably" had failed to summarize the revisions made to the PDEIR in the RE-DEIR as required by Guidelines section 15088.5, subdivision (g), but concluding that any such failure was not prejudicial:

> "The City was required to reference, discuss or list in some logical, meaningful way the changes made between the [PDEIR] and the [RE-D]EIR. Arguably, the City did not do this. The references cited by the City do not alert the reader as to the specific changes. On the other hand, this is not a situation where the re-circulation was driven by changes in the facts or conclusions reached within the EIR. The final EIR underwent a structural change, but maintained the same discussion regarding impacts and mitigation, and relied on the same data. Importantly, the City's failure was not prejudicial. There is no evidence suggesting the public was deprived of a meaningful opportunity to discuss and critique the [P]roject. Re-circulation was not used as an opportunity to insert new conclusions as to significant impacts on the community. Re-circulation did not prevent the relevant decision makers from reaching an informed final decision. There is no evidence that the City's failure to comply was done in bad faith. Therefore, any violation of Guidelines section 15088.5 was not prejudicial and does not constitute a basis on which to grant this Petition."

[17]    The City stated that it summarized the revisions to the PDEIR in the following sections of the RE-DEIR, "[Section] 1.4[,] Availability of this EIR, [Section] 3.2[,] Project Background, [Chapter] 4[,] History of Project Changes." We have summarized those provisions in part III.A.1.c.i, *ante.*

20

At the hearing on Save Civita's writ petition, Save Civita argued that there had been numerous substantive changes to the PDEIR, and Save Civita's counsel reviewed several of those changes at the hearing. For example, Save Civita's counsel noted that the PDEIR determined that there was "no environmentally superior alternative as compared to the proposed community plan amendment," while the FEIR[18] concluded that "the bicycle, pedestrian and emergency access only alternative is . . . the environmentally superior alternative." Save Civita's counsel argued that, in light of all the revisions to the PDEIR, the City's failure to summarize such changes was prejudicial because the "information [was] necessary to an informed decision."

The City argued:

> "[L]ooking at the merits of the discussion on section 15088.5[, subdivision] (g) CEQA guidelines, this is to summarize the revisions made. That's the requirement under CEQA. Summarize the revisions made. In this particular instance, these weren't just revisions, it was an entire structural redo. As a result of scoping comments that the public made and community interaction, they wanted more information. So instead of giving them a [programmatic] EIR, we went back and did a project level EIR. . . . The intent we believe of the Guidelines is that the public gets more information and that's what we tried to do at this point, not a reduction of information. At some point when you do red line drafts, which I'm sure your honor knows, it gets so confusing you can't even tell what has been added and what has been not added.

---

[18] While Save Civita's counsel compared the PDEIR with the FEIR rather than with the RE-DEIR, it appears that the FEIR and the RE-DEIR are not materially distinct with respect to any of the changes referenced by counsel.

21

"Also in this regard, there's no evidence to suggest the public was deprived of a meaningful opportunity to discuss the [P]roject."

After the hearing on Save Civita's writ petition, the trial court confirmed its tentative ruling and "clarif[ied]" that ruling, stating the following:

> "Regarding the re-circulation issue, the argument presented by [Save Civita] made several references to the administrative record that were not contained in [Save Civita's] briefing.[19]  These references are improper and cannot be considered by the Court because . . . [the] City has not had an opportunity to address or rebut these additional citations.  To some extent, these additional references support the City's argument:  the [RE-D]EIR contained significant organizational changes such that it would have been confusing, if not futile to attempt to list or 'redline' each change.  Ultimately, no prejudice was incurred.  The public was given ample opportunity to review and comment on the revised project level EIR.  The City did not seek to mislead the public [as] to whether it was necessary to review or comment on the revised project level EIR.  The administrative record contains evidence supporting the City's good faith understanding that a revised and re-circulated project level EIR would enhance the ability of the public and decision makers to understand and act on the [P]roject."

### d. *Analysis*

Guidelines section 15088.5, subdivision (g) required the City to "summarize the revisions made to the previously circulated draft EIR."

As outlined in detail in part III.A.1.c.i, *ante*, statements in the "Project Description" and the "History of Project Changes" chapters of the RE-DEIR summarized the changes to the PDEIR by stating that:  (1) the RE-DEIR

---

19    It appears that the trial court was referring to the substantive changes to the PDEIR that Save Civita's counsel outlined at the hearing.

22

"replaced" the PDEIR; (2) the Project had changed from a community plan amendment to an amendment *and* the construction of a major road, and (3) while the PDEIR had analyzed only "the programmatic action of the amendment to include Franklin Ridge Road in the Circulation Element of the Serra Mesa Community Plan," the RE-DEIR contained a "project-level analysis," of the foreseeable construction of the new road.  In short, these summary provisions of the RE-DEIR informed the public that the revisions to the PDEIR were extensive, and that the PDEIR had been "replaced" by the RE-DEIR.  As the City explained in the FEIR, given the extensive nature of the changes, "if the document was provided in strikeout/underline format, as suggested, nearly the entire document would be shown as strikeout/underline."

In interpreting the summarization mandate of Guidelines section 15088.5, subdivision (g), it is important to recall the context in which that mandate arises.  Section 15088.5, subdivision (a) requires the recirculation of an EIR where "significant new information is added to the EIR."  Such new information can "include changes in the project."  The "History of Project Changes," chapter of the RE-DEIR apprised the public that, in the wake of the issuance of the PDEIR, the City had conducted "further evaluation of the subsequent actions necessary to implement and construct the roadway connection."  Thus, the RE-DEIR summarized the changes in the Project that had occurred.

The summarization requirement in section 15088.5, subdivision (g) also must be interpreted in connection with section 15088.5, subdivision (f), which requires that an agency inform the public that "[w]hen an EIR is substantially revised and the entire document is recirculated," comments on a prior EIR will not receive a response.  The City's compliance with section

23

15088.5, subdivision (f) further alerted the public that substantial changes had been made to the PDEIR.

In sum, where a recirculated EIR states that it is replacing a prior EIR and the agency makes clear the overall nature of the changes (as the City did in this case), and states that prior comments will not receive responses, the agency may be said to have complied with the Guidelines requirement that it "summarize the revisions made to the previously circulated draft EIR." (§ 15088.5, subd. (g).)

However, even if we were to assume that the City failed to comply with section 15088.5, subdivision (g), we agree with the trial court that any such failure was not prejudicial. Save Civita argues, " 'An EIR will be found legally inadequate – and subject to independent review for procedural error – where it omits information that is both required by CEQA *and necessary to informed discussion.*' " (Italics added, citing *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 986; see also *Sierra Club, supra*, 6 Cal.5th at p. 515 [an agency's "failure to comply with the law subverts the purposes of CEQA" and constitutes prejudicial error if the agency "omits material *necessary to informed decisionmaking and informed public participation*" (italics added)].)

Save Civita argues that the City's failure to summarize the changes in the RE-DEIR from the PDEIR had "two detrimental consequences," namely, it forced readers to "leaf through thousands of pages," and caused "readers to have the mistaken belief" that the two EIRs address the same project. We are not persuaded. With respect to the first consequence, the need to review the entire RE-DEIR was driven by the nature of the changes (i.e., the changes to the PDEIR were wholesale and material). As to the second consequence, no reasonable reader could have been misled as to the

24

distinction between the nature of the projects evaluated in the PDEIR and the RE-DEIR, respectively. The RE-DEIR clearly and expressly stated that, while the PDEIR had evaluated a community plan amendment, the RE-DEIR evaluated the amendment *and* the construction of a major road.

Save Civita also argues that the City's failure to provide a summary was an "obstacle to informed discussion," but the administrative record indicates that there was ample and vigorous public discussion of the RE-DEIR. We agree with the trial court that such discussion was not hampered by the absence of a summary of the changes in the RE-DEIR. Save Civita also argues that failing to provide a summary required commentators to either resubmit letters or to "start over," with the latter option "being the non-obvious option," since the RE-DEIR indicated that it was a recirculated draft EIR. However, as discussed above, the City informed the public that comments on the PDEIR would *not* receive responses. Thus, the public was on notice of the need to resubmit comments or to submit new comments.

In sum, we conclude that the City did not violate Guidelines section 15088.5, subdivision (g) in failing to summarize the changes from the PDEIR to the RE-DEIR. We further conclude that, even assuming the City did violate Guidelines section 15088.5, subdivision (g), such error was not prejudicial because any failure to summarize did not deprive the public of a meaningful opportunity to discuss and critique the Project.

2. *The FEIR reasonably did not analyze in detail the Amend MVCP Alternative as an alternative to the Project*

Save Civita claims that the FEIR was deficient because it failed to analyze in detail the Amend MVCP Alternative as an alternative to the Project.

25

a. *Relevant law*

"CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts.  [Citations.]" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163 (*In re Bay Delta*).)

Guidelines section 15126.6, subdivision (a) states that an agency must describe a range of reasonable alternatives to the project, and provides in relevant part:

> "Alternatives to the Proposed Project.  An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives.  An EIR need not consider every conceivable alternative to a project.  Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation.  An EIR is not required to consider alternatives which are infeasible.  The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives.  There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason."[20]

---

[20]    The Guidelines describe the "rule of reason" by which an agency's selection of alternatives is judged as follows:

> "(f) Rule of reason.  The range of alternatives required in an EIR is governed by a 'rule of reason' that requires the EIR to set forth only those alternatives necessary to permit a reasoned choice.  The alternatives shall be limited to ones that would avoid or substantially lessen any of the significant effects of the project.  Of those alternatives, the EIR need examine in detail only the ones that the lead agency determines could feasibly attain most of the basic

An alternative that avoids significant environmental effects should be evaluated even if it "impede[s] to some degree the attainment of the project objectives, or would be more costly."  (Guidelines, § 15126.6, subd. (b).)

In selecting a range of alternatives to study in an EIR, an agency is to be guided by the following principles:

> "Selection of a range of reasonable alternatives.  The range of potential alternatives to the proposed project shall include those that could feasibly accomplish most of the basic objectives of the project and could avoid or substantially lessen one or more of the significant effects.  The EIR should briefly describe the rationale for selecting the alternatives to be discussed.  The EIR should also identify any alternatives that were considered by the lead agency but were rejected as infeasible during the scoping process and briefly explain the reasons underlying the lead agency's determination.  Additional information explaining the choice of alternatives may be included in the administrative record.  Among the factors that may be used to eliminate alternatives from detailed consideration in an EIR are:  (i) failure to meet most of the basic project objectives, (ii) infeasibility, or (iii) inability to avoid significant environmental impacts."  (Guidelines, § 15126.6, subd. (c).)

"[A]n EIR need not study in detail an alternative . . . that the lead agency has reasonably determined cannot achieve the project's underlying fundamental purpose."  (*In re Bay-Delta, supra*, 43 Cal.4th at p. 1165.)  As the *In re Bay-Delta* court explained:

> "[A] lead agency may structure its EIR alternative analysis around a reasonable definition of underlying purpose and

> objectives of the project.  The range of feasible alternatives shall be selected and discussed in a manner to foster meaningful public participation and informed decision making."  (Guidelines, § 15126.6, subd. (f).)

27

need not study alternatives that cannot achieve that basic goal. For example, if the purpose of the project is to build an oceanfront resort hotel [citation] or a waterfront aquarium [citation], a lead agency need not consider inland locations. (See also *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 715 [lead agency need not consider lower density alternative that would defeat primary purpose of providing affordable housing].)" (*Id.* at p. 1166.)

### b. *Standard of review*

We determine whether the City's decision not to analyze in detail the Amend MVCP Alternative as an alternative to the Project is supported by substantial evidence and is consistent with the rule of reason. (See *In re Bay-Delta, supra*, 43 Cal.4th at p. 1167 [stating that agency's determinations that project objective could not be achieved with proposed alternative were "supported by substantial evidence and consistent with the rule of reason"].)

### c. *Factual and procedural background*

#### i. *The Amend MVCP Alternative*

The Amend MVCP Alternative would amend the MVCP to remove a proposed road connection between Phyllis Place and Franklin Ridge Road / Via Alta from that planning document.

#### ii. *The FEIR's objectives*

The FEIR outlines the following objectives for the Project:

"1. Resolve the inconsistency between the [MVCP] and the [SMCP] by providing a multi-modal linkage from Friars Road in Mission Valley to Phyllis Place in Serra Mesa.

"2. Improve local mobility in the Serra Mesa and Mission Valley planning areas.

"3. Alleviate traffic congestion and improve navigational efficiency to and from local freeway on and off-ramps for the surrounding areas.

28

"4. Improve emergency access and evacuation route options between the Serra Mesa and Mission Valley planning areas.

"5. Provide a safe and efficient street design for motorists, cyclists, and pedestrians that minimizes environmental and neighborhood impacts."

> iii. *The FEIR's stated reasons for not studying the Amend MVCP Alternative as an alternative to the Project*

The FEIR stated that the City had initially considered four possible alternatives to the Project for evaluation, including the Amend MVCP Alternative.[21]  The FEIR explained that the City had not selected the Amend MVCP Alternative as an alternative for detailed study for the following reasons:

> "The No Build/Remove from Mission Valley Community Plan Alternative would not include the construction and operation of the roadway connecting Phyllis Place to Franklin Ridge Road/Via Alta, and would remove language regarding the potential connection from the Mission Valley Community Plan.  This alternative was rejected from further consideration because it would not meet any of the [P]roject objectives, as detailed below.
>
> "1. This alternative would resolve the inconsistency between community plans; however, it would not provide a multi-modal linkage from Friars Road in Mission Valley to Phyllis Place in Serra Mesa, as no roadway would be constructed, thereby limiting multi-modal options between these roadways.  Therefore, it would not fully meet this objective.

---

[21]    In the FEIR, the City referred to this option as the "No Build/Remove from Mission Valley Community Plan Alternative."

"2. This alternative would not improve local mobility in the Serra Mesa and Mission Valley planning areas, as no roadway would be constructed, thereby limiting routes between these planning areas.

"3. This alternative would not help to alleviate traffic congestion and improve navigational efficiency to and from local freeway on- and off-ramps for the surrounding areas, as no roadway would be constructed, thus limiting access options for those in the areas within the vicinity of the [P]roject site.

"4. This alternative would also not improve emergency access and evacuation route options between the Serra Mesa and Mission Valley planning areas, as it would not provide additional ingress/egress for emergency responders, nor would an additional emergency evacuation route be created.

"5. Finally, this alternative would not provide a safe and efficient street design for motorists, cyclists, and pedestrians, as no roadway would be constructed.

"Furthermore, although this alternative would remove the language associated with the roadway connection, it would not resolve the inconsistency with other land use plans that have already been adopted.  For example, the City's Climate Action Plan and Bicycle Master Plan . . . include the proposed roadway connection in their assumptions. Therefore, this inconsistency would require additional environmental analysis prior to removal from the Mission Valley Community."

    iv. *The claim at the administrative level*

In comments on the RE-DEIR, reprinted in the FEIR, an attorney for the Serra Mesa Community Council stated that the City had "failed to present a reasonable range of project alternatives because it did not correctly include or conclude analyses of one or more identified adverse effects or

mitigating alternatives." Counsel specifically contended that the RE-DEIR "never properly analyzed or considered," the "[MVCP] amendment consistency option." The City responded to this comment in the FEIR by stating that it had provided a reasoned explanation for not selecting the Amend MVCP Alternative as an alternative for detailed study in the RE-DEIR.

v. *Save Civita's claim in the trial court*

In its writ petition, Save Civita claimed that "substantial evidence does not support the [FEIR's] conclusion that an MVCP amendment alternative is unworthy of more in-depth consideration."

The trial court rejected Save Civita's claim, reasoning:

> "Section 9.4.1.2 of the [F]EIR addresses the 'No Build/Remove from Mission Valley Community Plan Alternative.' [Citation.] Although this alternative removes the inconsistency, it does not fulfill the other objectives such that this alternative was not analyzed in detail. Section 9.5.1 of the [F]EIR addresses the no project alternative in detail. [Citation.] The analys[e]s in both sections are complimentary and sufficient, and fostered informed decision making and informed public participation. Lead agencies are entitled to exercise discretion to exclude consideration of alternatives that do not meet a project's fundamental purpose or are inconsistent with the basic nature of the project. After a detailed analysis, the [F]EIR concludes that the goals of alleviating traffic congestion and improving navigational efficiency to and from local freeway ramps would best be met utilizing this connector road. Substantial evidence exists within the administrative record supporting the City's conclusion that the no build alternatives did not meet most of the basic [P]roject objectives. The record reflects a complete analysis regarding issues of mobility, traffic congestion, navigational efficiency, the City's Climate Action Plan, emergency access, air quality, noise, etc."

### d. *Application*

Save Civita advances several arguments in support of its claim that the FEIR is deficient because it failed to analyze the Amend MVCP Alternative in detail as an alternative to the Project. We find none to be persuasive.

First, Save Civita argues that because the "impetus to this Project" was allegedly "the inconsistency between the MVCP and the SMCP with respect to this potential roadway connection," (boldface & italics omitted) a "feasible alternative would have been amending the MVCP *to remove* the road connection." (Boldface omitted.) However, there is considerable evidence in the record that improving connectivity between Serra Mesa and Mission Valley via a new road has *always* been the central objective of the Project. For example, in the 2008 resolution (R-304297) referenced in part II.A.3, *ante*,[22] the City Council stated that "*the construction of the street connection* between Phyllis Place and Friars Road and the associated land use plan amendments were analyzed in [EIR] No. 49068 certified for the [Civita] [p]roject," and the City Council directed "staff to analyze the following issues in relation to the aforementioned *street connection*," (italics added) including:

> "1. Whether police and fire response times would be improved with the *road connection*.
>
> "2. Whether the *road connection* could serve as an emergency evacuation route.
>
> "3. Whether it is feasible to make *the road* available for emergency access only.

---

[22] The FEIR notes in a response to a comment that the Project "results from the City Council initiating an amendment to the [SMCP] on October 21, 2008 (Initiative R-304297), and directing the Planning Department to address the issues and impacts related to construction and operation associated with the proposed roadway connection to Phyllis Place."

32

"4. Whether pedestrian and bicycle access would be improved by *the street connection*." (Italics added.)

Further, while the PDEIR stated that *one* of the objectives of the Project was to "[r]esolve the inconsistency between the [SMCP] and [MVCP] as it pertains to a connection from Mission Valley to Phyllis Place in Serra Mesa," the PDEIR's *second* objective was to amend the SMCP "to include a street connection," that, "if built," could:

"[1.] Improve the overall circulation network in the Serra Mesa and Mission Valley planning areas.

"[2.] Alleviate traffic congestion and improve navigational efficiency to and from local freeway on- and off-ramps for the surrounding areas.

"[3.] Along the street connection, allow for safe travel conditions for motorists, cyclists, and pedestrians [along the street connection].

"[4.]Implement the General Plan and Bicycle Master Plan as they pertain to developing interconnectivity between communities."

In short, Save Civita's suggestion that the Project morphed from being primarily about a planning amendment to being primarily about a road connection is not entirely accurate. While the PDEIR indicated that it was analyzing a community plan amendment at the programmatic level, the objective of the Project as described in the PDEIR was not merely to resolve the inconsistency between two planning documents, but rather, to adopt an amendment to the SMCP that would eventually permit the construction of a road to improve connectivity between Serra Mesa and Mission Valley. In any event, even assuming that the "impetus" of the Project had been merely maintaining consistency in planning documents, an agency is required to

33

determine whether the alternative meets "most of the basic project *objectives*," (Guidelines, § 15126.6, subd. (c), italics added) not whether it is consistent with the *impetus* of the project. Thus, we are unpersuaded by Save Civita's suggestion that the City was required to study in detail the Amend MVCP Alternative because that alternative was allegedly consistent with the impetus of the Project.

In a related argument, Save Civita suggests that the City improperly effectuated a "significant shift," in the Project's objectives from the PDEIR to the FEIR, and that the City used an "artificially narrow definition" of the Project's objectives in the FEIR so "that the Amend MVCP alternative would appear infeasible." Save Civita's argument is supported by neither the facts nor the law. Factually, as suggested above, a comparison of the objectives contained in the PDEIR (see *ante*), and those in the FEIR (see III.A.2.c.ii, *ante*), reveals stylistic changes as well as incremental modifications to the objectives as the Project shifted from a programmatic EIR studying a community plan amendment to facilitate the construction of a new road connector to a project-level EIR studying the construction of the road itself. However, we see nothing about these modifications to the objectives of the Project that demonstrates an intent to eliminate the Amend MVCP Alternative as an alternative worthy of detailed study. In fact, the City also reasonably concluded *in the PDEIR* that the Amend MVCP Alternative was not worthy of detailed study because it "would not promote intercommunity connectivity as envisioned in the City's General Plan."

In any event, even assuming that the City *had* fundamentally changed the objectives of the Project, Save Civita presents no persuasive legal argument that such a change would have been improper. *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, which Save Civita cites for the

proposition that an "accurate, stable and finite project description is the sine qua non of an informative and legally sufficient EIR," (*id.* at p. 199, italics omitted) is entirely distinguishable.  In *County of Inyo*, the Court of Appeal concluded that the EIR at issue was faulty because "the project concept expands and contracts from place to place *within* the EIR," (*id.* at p. 190, italics added), noting that the "EIR does not cling to its truncated project description," provided at the outset of the EIR, but "[r]ather . . . shifts from that description to a 'reappraisal' of the rate of water export and then to a third concept called the 'recommended project.' " (*Id.* at p. 197.)  The *County of Inyo* court reasoned, that, "[t]he incessant shifts among different project descriptions . . . vitiate the city's EIR process as a vehicle for intelligent public participation." (*Id.* at p. 197.)  Unlike in *County of Inyo*, there are no changes in the Project or its description *within* the FEIR.

Save Civita also notes that, " ' "A lead agency may not give a project's purpose an artificially narrow definition." ' " (Quoting *North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, 668 (*North Coast Rivers Alliance*).)  In *North Coast Rivers Alliance*, the lead agency "purport[ed] to view eradication [of an agricultural pest] as the 'objective,' " (*id.* at p. 668) of the project, and on this basis failed to study the "control" of the pest as a potential alternative. (*Ibid.*)  In addition, the EIR "confusingly mislabeled various tools for attacking [the pests] as 'alternatives' to the program." (*Id.* at p. 667.)  The *North Coast Rivers Alliance* court concluded that the "protection of plants and crops," (*id.* at p. 669) rather than "eradication," (*ibid.*) was "clearly" (*ibid.*) the objective of the project, and that this error led the agency to have an " 'artificially narrow,' " definition of the project. (*Id.* at p. 668.)

Save Civita claims that, like the situation in *North Coast Rivers Alliance*, "the RE-DEIR/FEIR summarily dismissed any alternative that did not construct a road." We are not persuaded. To begin with, the RE-DEIR/FEIR *did* study an alternative that did not result in the construction of a new road—the No Project Alternative, and the RE-DEIR/FEIR also studied a second alternative—Bicycle, Pedestrian, and Emergency Access Only Alternative, that would not have resulted in a road that could be used by private vehicles. In addition, unlike in *North Coast Rivers Alliance*, the City neither conflated methods and objectives, nor developed an artificially narrow set of objectives. On the contrary, the FEIR broadly defined the objectives of the Project as including: improving consistency among planning documents, providing a multi-modal linkage within the Project area, improving local mobility, alleviating traffic congestion and navigational efficiency, improving emergency and evacuation access, and providing a safe street design. (See pt. III.A.2.c.ii, *ante*.) We therefore reject Save Civita's contention that reversal is required under *North Coast Rivers Alliance* on the ground that "creating objectives so narrow that they could not be met by anything other than the proposed project does not meet the requirements of CEQA, in letter or in spirit."

Save Civita also argues that the "Amend MVCP [A]lternative achieved most of the Project's [objectives.[23]]" We are not persuaded. By way of summary, the City reasonably concluded that an amendment to a community planning document to *remove* a road connection would not achieve the fundamental objective of *improving* connectivity between Mission Valley and Serra Mesa. Specially, the City reasonably concluded that the Amend MVCP

---

[23] Save Civita's brief contains the word "alternatives," but it is clear that the intended word is "objectives."

Alternative would *not* achieve any of the following objectives outlined in the FEIR: "provid[ing] a [new] multi-modal linkage," "improv[ing] local mobility in the Serra Mesa and Mission Valley planning areas," "alleviat[ing] traffic congestion and improv[ing] navigational efficiency," "improv[ing] emergency access and evacuation route options between the Serra Mesa and Mission Valley planning areas," or "provid[ing] a safe and efficient street design." (See pt.III.A.2.c.iii, *ante*.) Save Civita's arguments to the contrary are without merit. In essence, Save Civita's arguments boil down to the contention that there is evidence that *not building the Project* would achieve the objectives of the Project better than completing the project would. For example, in its brief, Save Civita argues, "multi-modal linkages . . . already exist," "there are already routes and linkages between the communities," the "Amend MVCP [A]lternative – *i.e.*, not building the roadway – would be better for traffic congestion than the Project," "emergency access from Serra Mesa to Mission Valley already exists," and "Via Alta and Franklin Ridge already provide a safe and efficient design" (italics and boldface omitted). These arguments are unpersuasive, both because they do not demonstrate that *amending the MVCP* would achieve these objectives, and because the No Project Alternative analyzed these issues.

Save Civita's complaint that the FEIR provided "no data or analysis to support," its conclusion that the Amend MVCP Alternative "would not meet four of the five listed objectives" is also without merit. To begin with, an agency need only "*briefly* describe the rationale for selecting the alternatives to be discussed," and "*briefly* explain," the reasons why an alternative was not selected for detailed study. (Guidelines, § 15126.6, subd. (c), italics added.) The FEIR complies with this mandate by providing a brief explanation for its reasons for not selecting the Amend MVCP Alternative for

37

in depth study.  (See pt. III.A.2.c.iii, *ante*.)  Further, the FEIR is replete with "data" and "analysis" about the No Project Alternative, and in particular, the impact of selecting such an alternative on "Transportation and Circulation." The City could reasonably conclude that because the Amend MVCP Alternative and the No Project Alternative would both result in the road connector not being built, they would likely have similar impacts.

Finally, Save Civita argues that the "trial court erred in equating the No Project Alternative with the Amend MVCP [A]lternative."  We reject this argument for two reasons.  First, it is clear that the trial court did not "equat[e]" the No Project Alternative with the Amend MVCP Alternative.  On the contrary, the trial court noted the distinction between the two alternatives.  The court cited to the separate sections in the FEIR in which the two alternatives are discussed and summarized two key conclusions of the FEIR concerning the Amend MVCP Alternative, namely, that it resolves the inconsistency between the two community planning documents, but does not fulfill the other objectives of the Project.  In addition, rather than "equating" the two alternatives, the trial court observed that the analysis of the two alternatives in the FEIR was "complementary."[24]  Second, it cannot

---

24    As noted in part III.A.2.c.v, *ante*, the trial court's statement of decision provided in relevant part:

> "Section 9.4.1.2 of the [FEIR] addresses the 'No Build/Remove from Mission Valley Community Plan Alternative.' [Citation.]  Although this alternative removes the inconsistency, it does not fulfill the other objectives such that this alternative was not analyzed in detail. Section 9.5.1 of the [FEIR] addresses the no project alternative in detail.  [Citation.]  The analys[e]s in both sections are complimentary and sufficient, and fostered informed decision making and informed public participation."

reasonably be disputed that, with respect to *many* impacts, the No Project Alternative and the Amend MVCP Alternatives *are* similar, if not identical, even if they are not identical as to *all* impacts. To state the obvious, and as discussed above, under both the No Project Alternative and the Amend MVCP Alternative, no road would be built. Thus, the effects of selecting either of these alternatives would be similar in many respects. Indeed, in their opening brief in this court, *Save Civita* equated the two alternatives in arguing that "there is substantial evidence in the record demonstrating that the *Amend MVCP [A]lternative - i.e., not building the roadway -* would be better for traffic congestion than the Project." (Italics added.) The similarity of the two alternatives further supports the City's decision not to subject the Amend MVCP to independent detailed study in the FEIR. (See *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1358–1359 (*Preservation Action Council*) [rejecting claim that agency was required to study "Alternative 2," because agency "had already analyzed a range of alternatives directed at the same goal and Alternative 2 did not appear to be substantially different or potentially feasible"].)

In short, given the overwhelming evidentiary support for the City's conclusion that the Amend MVCP Alternative would not have achieved the vast majority of the Project's objectives and would not have meaningfully furthered analysis of the Project, we conclude that the FEIR was not defective for failing to study in detail the Amend MVCP Alternative.[25]

_____

25    Save Civita also claims that the FEIR erroneously concluded that the Amend MVCP Alternative would require additional environmental analysis before implementation due to inconsistencies with the Climate Action Plan and the Bicycle Plan Master Update. We need not consider this contention because even if Save Civita were correct in this regard, given the City's reasonable conclusion that the Amend MVCP Alternative fails to achieve the Project's fundamental objectives and fails to meaningfully further analysis of

3. *The FEIR is not defective for failing to adequately analyze the Project's traffic impacts*

Save Civita claims that the FEIR's analysis of the Project's traffic impacts is inadequate for two reasons. First, Save Civita claims that the FEIR's projection of the Project's impact on "vehicle miles traveled" (VMT) is clearly inadequate because it did not disclose the true margin of error associated with the projection. Save Civita also contends that the FEIR failed to adequately analyze "obvious traffic hazards" (boldface & underscore omitted) to two roads, Via Alta and Franklin Ridge, that the Project will allegedly cause.

We first outline the relevant law and standard of review governing both claims. We then consider each claim in turn.

a. *Governing law and standard of review*

" '[C]hallenges to the scope of the analysis, the methodology for studying an impact, and the reliability or accuracy of the data present factual issues, so such challenges must be rejected if substantial evidence supports the agency's decision as to those matters and the EIR is not clearly inadequate or unsupported.' " (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 425 (*City of Maywood*).) " 'The drafters of an EIR may . . . rely upon the credible opinions of experts concerning environmental impacts. [Citation.] [The party challenging the EIR] has the burden on appeal of demonstrating that these sources are so "clearly inadequate or unsupported" as to be "entitled to no judicial deference." [Citation.]' " (*Id.* at p. 424.) "We apply the substantial evidence test to conclusions, findings, and determinations, and to challenges to the

_____

the Project, the City was not required to study the Amend MVCP Alternative in detail irrespective of its consistency or inconsistency with these planning documents.

40

scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898.)

b. *Save Civita has not demonstrated that the FEIR's VMT calculation is clearly inadequate*

Save Civita claims that the FEIR "[m]isrepresented [t]raffic [d]ata," (boldface omitted) because it failed to adequately disclose that the VMT calculation for 2017 was subject to a 7 to 10% margin of error, and that the 2035 VMT calculation was subject to an even greater margin of error.

i. *Factual and procedural background*

(a.) *Relevant sections of the FEIR*

Section 5.2.4.1 of the FEIR describes the following predicted decreases in VMT in the near-term (2017) if the Project were constructed:

> "An analysis of the regional VMT was conducted with the implementation of the proposed roadway connection. The modeled VMT with the roadway connection under the Near-Term Scenario (Year 2017) within the study area[26] is 521,826. This represents a 1.8 percent decrease of VMT within the study area. With the proposed [P]roject, the region-wide VMT total is 1,518,696, a decrease of 0.32 percent."

Section 5.2.5.1 of the FEIR describes the following predicted decreases in VMT in 2035 if the Project were constructed:

> "With the proposed [P]roject, VMT within the study area would be 720,196, a 1.8 percent decrease in VMT when compared to the baseline condition in Year 2035. Region-wide, the VMT with the [P]roject would be 1,629,137, a 0.28

---

26    A map of the study area is contained in Appendix A, *post*.

percent decrease compared to the baseline condition in Year 2035."

Appendix H of the FEIR contains the VMT analysis and describes the modeling performed to produce the data contained in the appendix as follows:

> "Section 4.2,[27] Transportation/Circulation and Appendix C provide technical information on transportation model forecasting and detailed traffic operational analyses for the various freeway and roadway segments as well as intersections that would be affected as a result of the proposed [P]roject. This appendix includes the modeling results performed by SANDAG [San Diego Association of Governments] for the calculation of VMT within the [P]roject influence area. [¶] The [P]roject influence area is defined as all Traffic Analysis Zones (TAZ) where the [P]roject may cause an increase or decrease of 500 or more average daily trips (ADT)."

Appendix H also contains a figure depicting the "Community Plan Amendment [P]roject [I]nfluence [A]rea."

Appendix H contains a table that states, "the proposed [P]roject would reduce the VMT within the [P]roject influence area by 1.8% under both the Near-Term Year 2017 with Connection and the Cumulative Year 2035 with Connection scenarios. The proposed [P]roject would also reduce the region wide VMT by .32% under the Near-Term Year 2035 with Connection scenario and by .28% under the Cumulative Year 2035 with Connection scenario."

Appendix H explains the basis of its VMT conclusions stating, "The VMT analysis was conducted consistent with methodologies discussed in the technical white paper 'Vehicle Miles Traveled Calculations Using the SANDAG Regional Travel Demand Model' prepared by the San Diego Institute of Transportation Engineers (ITE)'s Transportation Capacity and

---

27  The intended citation is to Section 5.2.

Mobility Task Force in May of 2013 (ITE 2013) [(White Paper)]." The appendix also contains a citation with a hyperlink to the White Paper.

(b.) *The White Paper*

The White Paper is a highly technical report describing a model that may be used to perform VMT calculations, and a case study application of the model to a community in San Diego (North Park).

The conclusion of the White Paper states as follows:

> "The Methodology section of this white paper discusses the technical approach to using the traffic model to generate the three types of VMT trips.[28] Listing of the tools needed, the data input, general assumptions, and the steps required are discussed in detail in this section. . . . As shown in this paper, the methodology developed by SANDAG results in a 0.06% margin of error, which is well below the 0.1% margin of error threshold set by SANDAG."

---

28  The White Paper defines these trips in relevant part as follows:

**"1. Internal-to-Internal (I-I)**
This category includes trips that have both the Origin and Destination (two trip-ends) within the same city/community/development being analyzed. . . .

**"2. Internal-to-External, and External-to-Internal (I-E, E-I)**
This category includes trips with either the Origin or Destination (one trip-end) within the city/community/development being analyzed. . . .

**"3. External-to-External (E-E)**
The third category includes trips with neither Origin nor Destination (zero trip-ends) within the city/community/developments being analyzed. These are essentially trips passing through the city/community/development."

The administrative record contains an e-mail that a resident of Serra Mesa, Garbiela Surpi, sent to Mike Calandra, one of the authors of the White Paper.  Her e-mail states as follows:

> "I came across your [White Paper].  While reading it I was wondering if you could give an idea of the margin of error a given VMT predicted with this model would have.  The model uses inputs that by themselves are estimated projections so they carry some error that would propagate into the predictions.  As a rule of thumb would you say, in a typical situation, the error of a VMT calculated by model could be up to 1%, 5%, 10%, other?
>
> "Thanks you very much in advance for any guidance you can provide on how to interpret the output of the model considering its expected error."

In response, Calandra sent Surpi an e-mail that states:

> "Hi Gabriela,
>
> "Thank you for your interest in the VMT White Paper, and these are indeed some very good questions!
>
> "We spend a lot of time calibrating and validating SANDAG's travel demand model.  The process includes creating a base year model where the results can be compared to real-world observed data (ADT, VMT, travel time, etc.).  Calibration includes making adjustments to better replicate observed conditions, while validation includes statistical documentation of the performance.  There are many guidelines and resources regarding model calibration, and we try to adhere to what the Federal Highway Administration has produced.
>
> "The short and very general answer is for model validation to be within +/- 10% of observed conditions for the region as a whole.  A couple of interesting caveats include:  the higher-volume roads are easier to calibrate, and observed

data from Caltrans' freeway Performance Monitoring System confirms that travel on the freeways and highways can vary +/- 7% from day-to-day.

"You correctly point out that future-year scenarios might include input assumptions, however the model calibration process does not address this. Even a well calibrated and validated travel demand model will have a larger margin of error the further out into the future you go."

> (d.) *Comments in public hearings concerning the margin of error issue*

During the Planning Commission hearing, Surpi spoke against the Project. During her presentation, she stated:

"According to one of the principal authors of the [W]hite [P]aper that describes the methodology that was used for the vehicle miles traveled analysis, in general, a calibrated model generates a forecast that has a margin error of plus, minus 7 percent and can go up to plus, minus 10 percent. That is for near-term predictions. If you are trying to do long-term predictions, the errors are going to be higher, because any accuracy in the input propagates to your conclusions."

During the Planning Commission hearing, the following colloquy also occurred:

"Commissioner Whalen: We have a lot of communications saying that the EIR was wrong. Start with that part.

"Mr. Hajjiri: Let me -- good afternoon. This is Samir Hajjiri with the Planning Department, senior traffic engineer.

"Let me try to address the VMT numbers. The VMT numbers in the report were developed based on a methodology that was developed by SANDAG staff. The methodology relies on that -- on the travel forecasting model. It extracts information from the origin [and] destination. It's a very close approximation of the vehicle

miles traveled within the region and . . . from the study area of the [P]roject influence area.  So that -- that's the base tool available to us that we used to -- we used to report the numbers related to the VMT.

"Commissioner Whalen: It's worth mentioning that the courts have supported the level of accuracy of traffic modeling, too.

"Mr. Hajjiri: That -- that's definitely accurate.  And we rely on a calibrated model that basically -- that with ground-toothing effort that, basically, we -- relates the forecast volumes to the count volumes on the roadways.  And we use that information as a basis to create some traffic forecast to, basically, project future conditions on the roadways."

During her presentation before the City Council, in discussing the VMT analysis, Surpi stated:

"So the VMT reports a reduction of minus 1.8, minus 0.32, and minus [0.28] VMT.  However, the report fails to mention that there is a significant margin of error of ten percent.  When you include that margin of error that means, for example, if you say minus three, 0.32 plus minus ten percent, that means that the VMT can be very well as between minus ten and plus ten.  So that means there is no conclusion there that you can tell that the VMT is going to be reduced."[29]

A City Deputy Director of the Planning Department stated during the City Council hearing that "the VMT modeling used for this [P]roject was based on SANDAG modeling, the same modeling that we used to prepare our Climate Action Plan for the City that was adopted in 2015."

---

[29]    The contention that the margin of error for the VMT was much larger than disclosed in the RE-DEIR/FEIR was also made in comments on the RE-DEIR; in reports presented for a City Council committee; and in a memorandum that Save Civita sent to the City Council.

46

ii. *Analysis*

The law is clear that it is Save Civita's burden to demonstrate the clear inadequacy of the FEIR's methodology. (*City of Maywood, supra*, 208 Cal.App.4th at pp. 424–426.)

The FEIR explained that its VMT analysis was premised on a White Paper that utilized a SANDAG travel demand model. The FEIR also provided a hyperlink to the White Paper, which is contained in the administrative record. The administrative record also indicates that the SANDAG model has been used to prepare other planning documents, including the Climate Action Plan. Yet, despite charging that the projected decrease in VMT "was subject to a 7 to 10 percent margin of error," Save Civita's opening brief contains no analysis of the White Paper's methodology and no discussion of the margin of error identified in that document. Nor did Save Civita provide any expert testimony or any other evidence demonstrating that the FEIR's VMT analysis is subject to a 7 to 10 percent margin of error.

Instead of providing a reasoned analysis of the White Paper, Save Civita attempts to carry its burden of demonstrating that the FEIR's reliance on the White Paper was " 'clearly inadequate,' " (*City of Maywood, supra*, 208 Cal.App.4th at p. 425) entirely by way of Caldara's e-mail exchange with Supri. In his e-mail to Surpi, Calandra discussed the concepts of "calibration," and "validation," and stated, "Calibration includes making adjustments to better replicate observed conditions, while validation includes statistical documentation of the performance." Calandra then stated that

47

"[t]he short and very general answer[30] is for model validation to be within +/- 10% of observed conditions for the region as a whole," before noting that "observed data from Caltrans' freeway Performance Monitoring System confirms that travel on the freeways and highways can vary +/- 7% from day-to-day." It is not clear from this single e-mail exchange that Calandra was supplying the margin of error in the VMT forecasts contained in the FEIR.[31] Thus, we conclude that Save Civita has not carried the difficult burden of establishing that the FEIR's VMT analysis, which is built on a model developed by SANDAG that has been used in connection with other regional planning efforts, was " 'clearly inadequate.' " (*City of Maywood, supra,* 208 Cal.App.4th at p. 425.)

We are also not persuaded by Save Civita's contention that the FEIR is inadequate because it fails to disclose the potential for the Project to substantially *increase* VMT. Save Civita notes that the FEIR states that a significant environmental impact would occur "if the [P]roject would result in a substantial *increase* in VMT when compared to the baseline condition." (Italics added.) However, Save Civita's contention that the "Project could actually increase VMT by 10 percent now and by an even higher percent in the future," is based on nothing more than the single vague e-mail described above —a reed that we have found to be far too thin to establish the actual margin of error in the FEIR's VMT analysis. We therefore also conclude that

---

30    Supri stated in her e-mail, "As a rule of thumb would you say, in a typical situation, the error of a VMT calculated by model could be up to 1%, 5%, 10%, other?"

31    The City argues that Save Civita's "entire argument hangs on Mr. Calandra's 'very general answer' referencing 10% margin of error. But this relates to the model calibration in the Base Year, not the .06% margin of error for the VMT disaggregation methodology developed by SANDAG."

Save Civita has not demonstrated that the FEIR is clearly inadequate for failing to disclose a potential substantial increase in VMT.

    c. *Save Civita has not demonstrated that the Project would cause traffic hazards on Via Alta and Franklin Ridge that the FEIR failed to analyze*

      i. *Background*

Issue 4 of Section 5.2.6 of the FEIR analyzes the following question:

> "Would the proposed [P]roject result in an increase in traffic hazards for motor vehicles, bicycles, or pedestrians due to a proposed, non-standard design feature (e.g., poor sight distance or driveway onto an access-restricted roadway)?" (Italics omitted.)

In analyzing this issue, the FEIR notes that the proposed roadway connector was conceptually designed to be consistent with the City's Street Design Manual "and would not create a hazard for vehicles, bicycles, or pedestrians using the proposed roadway connection." The FEIR also discusses the following characteristics of the proposed roadway:

> "The proposed roadway would be approximately 460 feet long and classified as a four-lane Major street with an approximately 120-foot right-of-way and would include a design speed of 55 mph. The posted speed for the roadway may be different from the design speed. However, the posted speed cannot be determined before the facility is in operation. After the [P]roject is completed, the City would resurvey the roadway traffic and set the posted speed limits based on the factors determined by that survey, including but not limited to the 85th percentile speed. The posted speed would not exceed the design speed and safety would be a primary consideration for the limit set."

The FEIR determined that there was a single traffic hazard associated with construction of the proposed roadway, related to the sight distance between a church driveway and the roadway connection:

"City View Church, located on the north side of Phyllis Place, has a 50-foot-wide driveway that provides access to the Church's parking lot.  The proposed roadway connection would not align with the City View Church driveway, as it would be located approximately 150 feet west of the driveway.  This is because the roadway connection is required to be farther west in order to provide adequate sight distance due to the slight curve along Phyllis Place from the I-805 ramps.  Therefore, the intersection at Phyllis Place and the proposed roadway would not directly align with the City View Church driveway.

"As the roadway alignment cannot be shifted east to align with the driveway due to sight distance requirements, the driveway itself would need to be moved approximately 150 feet to the west, thus creating a four-way intersection at Phyllis Place.  However, as City View Church is privately owned, it is assumed for purposes of this analysis that the driveway would not be realigned as part of the proposed [P]roject.  Therefore, the proposed [P]roject would have the potential to result in a safety hazard for vehicles entering or exiting the City View Church, as sight distance from the driveway to the intersection would likely not be sufficient.  Impacts related to traffic hazards would therefore be potentially significant . . . and mitigation is required."

ii. *Analysis*

Save Civita raises several arguments in support of its contention that the FEIR fails to adequately study traffic hazards on Via Alta and Franklin Ridge.  First, Save Civita notes that evidence in the record establishes that both Via Alta and Franklin Ridge are "steep and curvy," and contends that, if the road curvature on Phyllis Place warranted mitigation for the City View Church driveway, "then the steep and curvy nature of Via Alta and Franklin Ridge should have likewise been considered significant enough to warrant study and mitigation for the residents of Civita."  The FEIR explains that the

50

mitigation recommended for the church driveway is due to the location of the driveway in relation to the proposed connector. The mitigation was *not* required merely because of the curvature of Phyllis Place. Save Civita does not identify any features on Via Alta and Franklin Ridge analogous to the church driveway as to which the FEIR is clearly inadequate in failing to study possible traffic hazard mitigations. Indeed, in response to a comment on the RE-DEIR, in discussing the church driveway, the FEIR states, "It should also be noted that no other residential or any other driveways would be affected by the proposed roadway."[32] In addition, in response to a comment concerning potential visibility issues on Via Alta, the FEIR states, "the proposed [P]roject does not include any hazardous design features on Via Alta that would result in dangerous conditions for drivers," Save Civita has not demonstrated that these statements are unreasonable.

Save Civita also notes that the impact of increased traffic on pedestrian crossings on the roads was discussed during public hearings on the Project. While it is true that safety issues were discussed during public hearings, Save Civita does not demonstrate that the FEIR is obviously deficient in failing to address safety concerns on these roads. The FEIR extensively studied the projected increased traffic on Via Alta and Franklin Ridge Road, and notes that the design of the two roads in question could safely accommodate such increased traffic. For example, in a response to Save Civita's comment on the RE-DEIR, the City stated the following:

> "This comment states that segments of Via Alta and Franklin Ridge Road will have limited pedestrian crossings with significant distance between crossings. It also states

---

[32] An agency's responses to comments on a draft EIR are "an integral part of the EIR," and may be considered in considering the sufficiency of an EIR's analysis of an issue. (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 517.)

51

that long-term traffic projections show Via Alta and Franklin Ridge operating at level of service (LOS) C and LOS F,[33] respectively.  The comment also asks several questions regarding if the [RE-]DEIR reviewed the projected volume of pedestrian traffic, pedestrian crossings, and pedestrian safety.

"Pedestrian circulation and linkages are detailed within the [Civita] Specific Plan.  For example, the Specific Plan states: 'Streetside sidewalks, separated from the streets by landscaped parkways, occur as pedestrian elements along [Civita] Boulevard, Community Lane, Russell Park Way, Via Alta and Franklin Ridge Road.  Sidewalks should be provided along local streets and private drives in accordance with the City of San Diego Street Design Manual (November 2002).'  Figure 4-14 from the [Civita] Specific Plan shows the pedestrian circulation and linkages within [Civita] and has been included as a figure within the FEIR [citation]. . . .  [I]nternal circulation within Civita was developed as part of the [Civita] project, including the locations of signalized, designated pedestrian crosswalks.  The proposed road connection would include bicycle lanes and a sidewalk for pedestrians, which would be consistent with the Street Design Manual.  It is assumed pedestrians would use designated crosswalks and comply with applicable City laws and regulations. . . .

---

33    The FEIR describes "level of service" (LOS) in the following manner:

"To determine if a roadway segment is operating effectively, a level of service (LOS) grade is applied.  LOS is an index used to quantitatively evaluate the operational quality of the roadway segments in the study area.  LOS on roadway segments is determined by the ratio of the roadway's volume divided by its design capacity, a metric known as volume to capacity (V/C) ratio.  LOS takes into account factors such as roadway geometries, signal phasing, speed, travel delay, freedom to maneuver, and safety, and expresses these conditions using a letter-graded scale, with 'A' representing free flow and 'F' representing considerable congestion and delay."

"*Although vehicle traffic along Via Alta and Franklin Ridge Road will increase as a result of the [P]roject, the roadways are designed to accommodate this amount of vehicle traffic.* In the long-term scenario (Year 2035), the segment of Franklin Ridge Road from Via Alta to Civita Boulevard is projected to operate at an LOS F [citation]. However, as detailed above, this would not result in an impact to pedestrian safety. Franklin Ridge Road has been designed with sidewalks separated from the streets by landscaped parkways and has multiple crossings and linkages [citation]. Therefore, as adequately detailed in the [RE-]DEIR, the proposed [P]roject would not result in an impact related to pedestrian safety. No revisions to the FEIR are warranted as a result of this comment." (Italics added.)

In addition, at the hearing on the Project before the City Council, a City representative stated the following:

"Additionally, pedestrian safety within the neighborhood of Civita has been brought up throughout this planning effort. Following Planning Commission, staff revisited the [Civita] Specific Plan and also conducted additional site visits to the area. It was observed that safe pedestrian connections have been developed with both the constraints of the topography and the projected roadway volumes for build out of the Civita neighborhood.

"[¶] . . . [¶]

"I'd also like to point out that there's an existing pedestrian under-crossing across Via Alta . . . .

" . . . Currently, there are crosswalks in place with curb ramps, enhanced paving, pedestrian refuges at the medians, and pedestrian scale lighting. So[,] if and when the roadway connection is constructed, the pedestrian improvements would continue with similar landscaping, sidewalks, designated bike lanes. They are consistent with the Bicycle Master Plan and similar safe pedestrian crossings at the intersection. . . .

"[¶] . . . [¶]

"Along Franklin Ridge Road, note the six-foot-wide sidewalks with landscape buffer and designated bike lane and the northern slopes with development beginning on the -- on the berm.

"So similar to Franklin Ridge, Via Alta includes dedicated bike lanes and sidewalks, separated by the road with landscaping. Via Alta is, approximately, a half-a-mile long. The farthest a pedestrian would need to travel in order to cross Via Alta would be, approximately, a quarter-of-a-mile. These distances and safe connections within the neighborhood are consistent with the General Plan and the recommendations in the General Plan Park Guidelines."
.

Save Civita fails to demonstrate that the City's discussion of the Project's impact on Via Alta and Franklin Ridge is clearly inadequate. While Save Civita asserts that "there are non-standard design features the impacts of which will be significant given the amount of traffic slated to be redirected to these roads," it fails to *identify* the specific "non-standard design features" of which it is complaining.

At bottom, Save Civita appears to be broadly arguing that the increased traffic projected on Via Alta and Franklin Ridge with the construction of the Project will present unspecified traffic hazards on these two roads. However, Save Civita does not demonstrate how this increased traffic would result in hazardous conditions. Merely noting that the roads are steep and that concerns have been raised about the adequacy of pedestrian crossings does not establish that the FEIR is inadequate for failing to adequately study alleged traffic hazards. Given Save Civita's failure to demonstrate how projected increased traffic on the two roads would likely result in specific traffic hazards that the FEIR failed to study, we

54

conclude that Save Civita has not demonstrated that the FEIR is " 'clearly inadequate' " in failing to adequately analyze alleged traffic hazards on Via Alta and Franklin Ridge. (*City of Maywood, supra*, 208 Cal.App.4th at pp. 425–426.)

### 4. *The FEIR is not defective for failing to discuss purported inconsistencies of the Project with the City's General Plan*

Save Civita claims that the FEIR fails to adequately discuss the Project's inconsistency with the City's General Plan.

#### a. *Governing law*

Guidelines section 15125, subdivision (d) provides in relevant part:

> "The EIR shall discuss any inconsistencies between the proposed project and applicable general plans . . . ."

Because EIRs are required to discuss only "any *inconsistencies*" between the project and planning documents (Guidelines, § 15125, subd. (d), italics added), *no analysis* is required if the project is *consistent* with the relevant plans. (See, e.g., *The Highway 68 Coalition v. County of Monterey* (2017) 14 Cal.App.5th 883, 894 (*The Highway 68 Coalition*).) Nevertheless, "Some EIRs go beyond the CEQA Guidelines requirement . . . and discuss plan consistency as well as inconsistency." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2021) Discussion of Consistency May Be Provided, § 12.29.)

#### b. *Standard of review*

We apply the standard of review discussed in part III.A.1.b, *ante*, to Save Civita's claim. (See *Sierra Club, supra*, 6 Cal. 5th at p. 516 [describing standard of review to be applied to claim that EIR failed to perform its function of informing the public of issues raised by a proposed project].)

c. *Application*

Save Civita claims that the FEIR "almost completely ignored," the General Plan's goal of promoting walkability and pedestrian-friendly development.[34] We disagree. Table 5.1-1 of the FEIR is a multi-page table titled, "Proposed Project's Consistency with the City of San Diego 2008 General Plan," that *repeatedly* discusses the Project's consistency with the General Plan's walkability goal. For example, Table 5.1-1 of the FEIR includes the following:

| Policy/ Recommendation Number | Goal/ Recommendation | Proposed Project | Proposed Project Consistency/ Inconsistency |
|---|---|---|---|
| A. Walkable Community Goal II | Create a safe and comfortable pedestrian environment. | The proposed [P]roject would include a street connection. Sidewalks would be included as part of the future implementation of the roadway (if constructed), as well as a landscape buffer between the | The proposed [P]roject is consistent with this goal. |

[34] We conclude in part III.B, *post*, that the City reasonably determined that the Project is consistent with the General Plan. We nevertheless assume for purposes of this opinion that this determination does not foreclose Save Civita's claim that the FEIR is deficient in failing to disclose the Project's purported inconsistency with the General Plan. (See *Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 462.) In *Stop Syar Expansion,* the appellant maintained that " '[t]he injury that [it] claims is not the Project's inconsistency with the General Plan as a whole as would be addressed by a Planning and Zoning Law (Gov. Code, § 65000 et seq.) action, but rather the *failure to adequately inform the public and decisionmakers* about inconsistencies with any policies as required by CEQA.' " (*Id.* at p. 462, underscore omitted.) Although expressing skepticism as to the legal validity of such a claim (see *id.* at p. 460 [stating that appellant's claim that the "EIR failed to address the project's asserted inconsistencies with the County's general plan," was "[n]ot [a] CEQA [i]ssue" (italics omitted)], the *Stop Syar Expansion* court ultimately considered appellant's claim on the merits. (*Id.* at p. 463.) We adopt the same approach here and consider Save Civita's claim on the merits.

56

| | | sidewalk and road for a safe and comfortable pedestrian linkage to the surrounding communities. | |
|---|---|---|---|
| A. Walkable Community Goal III | A complete, functional, and interconnected pedestrian network that is accessible to pedestrians of all abilities. | The proposed [P]roject would include a street connection that if implemented would include sidewalks that would serve as an Americans with Disabilities Act (ADA) compliant pedestrian facility that would link the communities of Serra Mesa and Mission Valley. | The proposed [P]roject is consistent with this goal. |
| A. Walkable Community Goal IV | Greater walkability achieved through pedestrian-friendly street, site, and building design. | The proposed [P]roject would include a street connection that if implemented would be designed to address pedestrian needs by providing pedestrian facilities such as sidewalks and landscaping along the roadway extension. | The proposed [P]roject is consistent with this goal. |

Save Civita also contends that the FEIR lacks substantial evidence to support its conclusion that the Project is consistent with the City's General Plan. Again, we disagree. As summarized in part III.B, *post*, the FEIR outlines numerous ways in which the Project is consistent with the General Plan.

Save Civita also maintains that the FEIR "omits relevant policies" from its analysis, including General Plan Policy, ME-C.6, which encourages that streets and roads be designed to promote community character. Save Civita quotes Policy ME-C.6 as providing:

> "Locate and design new streets . . . to: ***respect*** the natural environment, scenic character, and ***community character*** of the area traversed; and meet safety standards.

57

. . .
b. Design roadways and road improvements ***to maintain and enhance neighborhood character***."

The FEIR was not required to include *any* discussion of the Project's *consistency* with the General Plan (see, e.g., *The Highway 68 Coalition, supra*, 14 Cal.App.5th at p. 894), and it is plainly not defective for failing to address every *individual policy* within the General Plan.  Moreover, the FEIR does discuss a number of policies from the General Plan, including Policy ME-C.3, which provides:

> "Design an interconnected street network within and between communities that includes pedestrian and bicycle access while minimizing landform and *community character* impacts."  (Italics added.)

The FEIR reasonably finds that the Project is consistent with this policy, stating:

> "The proposed project would include a street connection linking the communities of Serra Mesa and Mission Valley. Impacts on community character and landform would be minimal because the surrounding area is already developed with homes, streets, and a church."

Finally, Save Civita claims that the FEIR is defective in that it concludes that the Project is consistent with the General Plan's Walkable Community Goals, despite the fact that the FEIR also concludes that the Project would result in an increase in traffic on roads in the Civita development.  The FEIR exhaustively considered this issue, and reasonably concludes, for the reasons outlined in part III.B, *post*, that the Project is consistent with the General Plan's goal of promoting walkability.

58

Accordingly, we conclude that the FEIR is not defective for failing to discuss purported inconsistencies of the Project with the City's General Plan.

B. *The City did not violate the Planning and Zoning law*

Save Civita claims that the City violated the Planning and Zoning Law (Gov. Code, §§ 65000, 65300) in approving the Project. Specifically, Save Civita contends that the Project is inconsistent with the "City of Villages concept" in the City's General Plan, "which emphasizes walkable communities and pedestrian-friendly features."[35]

1. *Governing law and standard of review*

In *Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552 (*Pfeiffer*), the Court of Appeal described the law governing a claim that a city's land use decision is inconsistent with the city's general plan:

> "Under the Government Code, every county and city is required to adopt ' "a comprehensive, long-term general plan for the physical development of the county or city. . . ." (Gov. Code, § 65300.) A general plan provides a " 'charter for future development' " and sets forth a city or county's fundamental policy decisions about such development. [Citation.] These policies "typically reflect a range of competing interests." [Citation.] Nevertheless, a city's land use decisions must be consistent with the policies expressed in the general plan. [Citation.] " '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' [Citation.]" [Citation.]' [Citation.]

---

[35] The City claims that Save Civita forfeited this claim by failing to adequately raise it either at the administrative level or in the trial court. We reject the City's forfeiture argument. At the administrative level, Save Civita opposed the Project and sent the City Council a memorandum that states in relevant part, "The Proposed Project is Inconsistent with the City of San Diego General Plan . . . ." (Underscore omitted.) In addition, Save Civita's writ petition in the trial court also expressly alleged that the Project is inconsistent with the General Plan.

> " ' " 'An action, program, or project is consistent with the
> general plan if, considering all its aspects, it will further
> the objectives and policies of the general plan and not
> obstruct their attainment.' [Citation.]" [Citation.] State
> law does not require perfect conformity between a proposed
> project and the applicable general plan . . . . [Citation.]'
> [Citation.] In other words, 'it is nearly, if not absolutely,
> impossible for a project to be in perfect conformity with
> each and every policy set forth in the applicable plan. . . . It
> is enough that the proposed project will be compatible with
> the objectives, policies, general land uses and programs
> specified in the applicable plan. [Citations.]' [Citation.]"
> (*Id.* at pp. 1562–1563.)

" 'A city's findings that the project is consistent with its general plan can be reversed only if [they are] based on evidence from which no reasonable person could have reached the same conclusion.' " (*Pfeiffer, supra*, 200 Cal.App.4th at p. 1563.)

2. *Application*

Save Civita claims that the Project is not consistent with the City of Villages concept in the general plan due to the "substantial increase in vehicle thru-traffic on three-residential roads," namely Phyllis Place, Via Alta, and Franklin Ridge.

Notwithstanding the projected increase in traffic, the City could have reasonably determined that the Project is consistent with the walkable village concept in the General Plan. As the FEIR notes, the Project would have pedestrian components that would "provide linkages among employment sites, housing, and villages." Specifically, "Sidewalks would be included as part of the future implementation of the roadway (if constructed), as well as a landscape buffer between the sidewalk and road for a safe and comfortable pedestrian linkage to the surrounding communities." The FEIR

60

also reasonably states, "pedestrian facilities would increase walkability in the area and accommodate pedestrian activity." In addition, the FEIR notes, in a response to a comment concerning the [P]roject's effect on walkability in the area, that "Existing signalized, designated pedestrian crosswalks are located at the intersection of Via Alta and Franklin Ridge Road and the intersection of Via Alta and Civita Boulevard."[36]

The City was not required to consider the walkability of Civita to the exclusion of all other policies discussed in the General Plan. (*Pfeiffer, supra,* 200 Cal.App.4th at p. 1563 [" 'policies in a general plan reflect a range of competing interests' "].) The City reasonably determined in the FEIR that the Project furthers numerous policies in the General Plan, including linking communities to the regional transit system,[37] reducing traffic congestion,

---

[36] In addition, as quoted in part III.A.3.c.ii, *ante*, another response to comment in the FEIR specifically addressed how the projected increased traffic on roads in Civita would likely impact pedestrian safety:

> "Although vehicle traffic along Via Alta and Franklin Ridge Road will increase as a result of the project, the roadways are designed to accommodate this amount of vehicle traffic. In the long-term scenario (Year 2035), the segment of Franklin Ridge Road from Via Alta to Civita Boulevard is projected to operate at an LOS F [Citation]. However, as detailed above, this would not result in an impact to pedestrian safety. Franklin Ridge Road has been designed with sidewalks separated from the streets by landscaped parkways and has multiple crossings and linkages . . . ."

[37] During the Planning Commission hearing on the Project, the State Transportation Commissioner stated: "I can tell you that the I-805-Phyllis Place interchange is a state asset that was built, not just to serve . . . a small hamlet of 220 homes but instead to be part of a regional transportation plan. Mission Valley and Serra Mesa will definitely benefit from the additional north-south connection."

increasing multi-modal transportation choices, preventing a closed loop-subdivision, improving traffic circulation, and reducing greenhouse gas emissions.

In the end, while the Project is predicted to increase traffic on several roads, the City could reasonably determine that the Project would further numerous policies in the General Plan while preserving walkability in the Civita development. In short, the City reasonably " 'weigh[ed] and balance[d] the plan's policies,' " in approving the Project. (*Pfeiffer, supra,* 200 Cal.App.4th at p. 1563.)

Accordingly, we conclude that the City did not act arbitrarily or capriciously in determining that the Project is consistent with the General Plan.

C. *The City Council, in certifying the FEIR and approving the Project, acted in a quasi-legislative capacity and therefore was not subject to procedural due process requirements applicable to quasi-adjudicatory hearings*

Save Civita claims that the City's certification of the FEIR and its approval of amendments to the SMCP and City General Plan were quasi-adjudicatory decisions.[38] Save Civita further contends that the City violated the public's procedural right to due process and a fair hearing because a member of the City Council who voted to approve the FEIR and the Project

---

[38]     Specifically, Save Civita argues, "The certification of an EIR and attendant approval of a project are reviewed under the administrative-mandamus procedures under Code of Civil Procedure Section 1094.5. *See . . .* § 21168." " ' "[W]hen functioning in such an adjudicatory capacity, the city council must be 'neutral and unbiased.' " ' "

As explained in part III.C.2, *post*, quasi-adjudicative decisions are reviewed by way of administrative mandamus pursuant to Code of Civil Procedure Section 1094.5 and section 21168. Quasi-legislative decisions are reviewed by way of traditional mandamus pursuant to section Code of Civil Procedure Section 1085 and section 21168.5.

was, according to Save Civita, "a cheerleader for the Project and decided he was going to approve the Project long before any evidence was presented to the [Smart Growth & Land Use Committee] or City Council."[39]

The threshold question of whether the City acted in a quasi-adjudicatory capacity in certifying the FEIR and approving amendments to planning documents raises a question of law. We review this question of law de novo. (See *Abatti v. Imperial Irrigation Dist.* (2012) 205 Cal.App.4th 650, 668 [questions of law arising in CEQA cases are reviewed de novo).]

1. *Factual and procedural background*

In its brief in support of a petition for writ of mandamus, Save Civita cited Code of Civil Procedure section 1094.5, subdivision (b),[40] and maintained that the City had deprived the public of its right to a fair trial. In support of this contention, Save Civita noted that, after the RE-DEIR was released for public review and prior to public hearings on the Project, City

---

[39]    While this appeal was pending, we requested that the parties file supplemental briefs addressing the following two questions:

> "1. Were the City's certification of the [F]EIR and approval of the amendments to planning documents in this case quasi-*adjudicatory* decisions, reviewable pursuant to Public Resources Code section 21168 and Code of Civil Procedure section 1094.5 or quasi-*legislative* decisions, reviewable pursuant to Public Resources Code section 21168.5 and Code of Civil Procedure section 1085?"

> "2. Would a determination that the City was acting in a quasi-*legislative* capacity foreclose appellant's procedural due process claim?"

We have reviewed the parties' briefing in addressing Save Civita's claim.

[40]    We discuss Code of Civil Procedure section 1094.5 in part III.C.2.a.ii, *post*.

Council Member Scott Sherman's staff sent e-mails to various associations seeking support for the Project and, on at least one occasion, offered to write a letter of support for the Project on behalf of a group. In addition, Save Civita noted that on the day after the Planning Commission recommended approval of the Project, a staff member from Council Member Sherman's office sent out an e-mail to those who had attended the meeting thanking them for their support and seeking their support in future proceedings related to the Project. Save Civita claimed that these actions demonstrated that Council Member Sherman did not act in an impartial matter at the City Council hearing on the Project. Accordingly, Save Civita argued, "the hearing failed to comport with the fair-hearing aspect of due process."

In its opposition, the City maintained that Save Civita had not "identified any actions by Mr. Sherman that approach establishing an 'unacceptable probability of actual bias.'" In support of this contention, the City noted that Save Civita had "only identifie[d] several emails sent, not by Mr. Sherman, but by his district office staff generally seeking support for the Project." According to the City, such evidence did not meet the "exacting standard to prove actual bias."

After further briefing and a hearing, the trial court rejected Save Civita's argument in its order denying its Petition / Complaint. The trial court reasoned in part:

> "[Save Civita] has not identified actions by Councilperson Sherman that establish a probability of actual bias. [Save Civita] does not identify any concrete facts showing actual bias. Mr. Sherman's office was entitled to communicate with constituents and take a position regarding approval of the connector road. Mr. Sherman's motives are irrelevant when assessing the validity of the [P]roject approval."

64

2. *Governing law*

    a. *Quasi-legislative and quasi-adjudicative decisions*

        i. *The distinction between quasi-legislative and quasi-adjudicative acts*

"City council members wear multiple hats.  It is commonly understood that they function as local legislators.  But *sometimes* they act in a quasi-adjudicatory capacity similar to judges.  (*Woody's Group, Inc. v. City of Newport Beach* (2015) 233 Cal.App.4th 1012, 1021 (*Woody's*).) . . . [¶] *'[W]hen functioning in such an adjudicatory capacity*, the city council must be "neutral and unbiased." ' (*Woody's, supra*, 233 Cal.App.4th at p. 1021 [citation]; see also Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2019) ¶ 3:426, at p. 3-70 ['A decisionmaker must be unbiased (meaning that the decisionmaker has no conflict of interest, has not prejudged the specific facts of the case, and is free of prejudice against or in favor of any party)'].)" (*Petrovich Development Co., LLC v. City of Sacramento* (2020) 48 Cal.App.5th 963, 973 (*Petrovich*), italics altered.)

In *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160 (*Beck Development Co.*) the court summarized the distinction between quasi-legislative and quasi-adjudicative actions, and noted that principles of procedural due process do *not* apply to quasi-legislative actions:

> "In considering the applicability of due process principles, we must distinguish between actions that are legislative in character and actions that are adjudicatory. . . .  [T]he terms 'quasi-legislative' and 'quasi-judicial' are used to denote these differing types of action.  Quasi-legislative acts involve the adoption of rules of general application on the basis of broad public policy, while quasi-judicial acts involve the determination and application of facts peculiar to an individual case.  [Citations.]  *Quasi-legislative acts*

65

*are not subject to procedural due process requirements*[41] while those requirements apply to quasi-judicial acts regardless of the guise they may take. . . ." (*Id.* at p. 1188, italics added.)

The principle that procedural due process protections do *not* apply to quasi-legislative action is well established. (See, e.g., *Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502, 525 [no constitutional issue of procedural due process was presented because Board was acting in a quasi-legislative capacity]; *Horn v. County of Ventura* (1979) 24 Cal.3d 605, 612–613 [stating that it is "well settled . . . that only those governmental decisions which are *adjudicative* in nature are subject to procedural due process principles. *Legislative* action is not burdened by such requirements. [Citations]"].) " 'Legislative action generally is not governed by these procedural due process requirements because it is not practical that everyone should have a direct voice in legislative decisions; elections provide the check there. [Citations.]' " (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 526.)

ii.  *Judicial review of quasi-legislative and quasi-adjudicative acts*

Quasi-legislative actions are generally reviewed by a proceeding in ordinary or traditional mandate (Code Civ. Proc., § 1085), in which judicial review is confined to the question whether the classification is arbitrary, capricious, or without reasonable or rational basis. (*County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 648–655.)

---

41  The right to an adjudicator who has not "prejudged the specific facts of the case,"— the right that Save Civita claims was violated in this case—is a right that attaches when local legislators "act in a quasi-adjudicatory capacity similar to judges." (*Petrovich, supra*, 48 Cal.App.5th at p. 973.)

Administrative mandamus (Code Civ. Proc., § 1094.5) is available only when "by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer . . . ." (*Id.*, subd. (a); see, e.g., *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 571 [" '[T]he intent of the Legislature in enacting [Code of Civil Procedure section] 1094.5 was to authorize ". . . judicial review. . . of an adjudicatory or quasi-judicial function" ' "].)

> b. *Judicial review under CEQA*

> i. *Statutory framework*

Sections 21168 and 21168.5 outline the manner by which a party may obtain judicial review of an agency's decision under CEQA. Except for proceedings under section 21168 to challenge quasi-adjudicatory decisions, section 21168.5 governs judicial review of all decisions by a public agency under CEQA. Section 21168.5 provides in relevant part:

> "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

Section 21168 governs judicial review of a public agency's CEQA *quasi-adjudicative* decisions:

> "Any action or proceeding to attack, review, set aside, void or annul a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested

67

in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure.

"In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record."

### ii. *Western States*

In *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566 (*Western States*), the Supreme Court outlined the distinction between administrative and traditional mandamus and between review under sections 21168 and 21168.5 as follows:

"A party may seek to set aside an administrative decision for failure to comply with CEQA by petitioning for either administrative mandamus (Code Civ. Proc., § 1094.5) or traditional mandamus (*id.*, [Code Civ. Proc.,] § 1085). A petition for administrative mandamus is appropriate when the party seeks review of a 'determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with [CEQA],' generally referred to as an 'adjudicatory' or 'quasi-judicial' decision. (. . . § 21168; see *Langsam v. City of Sausalito* (1987) 190 Cal.App.3d 871, 879 ['It is well established that the intent of the Legislature in enacting [Code of Civil Procedure section] 1094.5 was to authorize ". . . judicial review only of the exercise by an administrative agency of an adjudicatory or quasi-judicial function." ']; see also Cal. Administrative Mandamus (Cont.Ed.Bar 1989) § 1.1, p. 2 [administrative mandamus is the 'procedure used to obtain judicial review of adjudicative decisions (i.e., decisions that determine what the facts are in relation to specific private rights or interests)'].) A petition for traditional mandamus is appropriate in all

68

other actions brought 'to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA].' [Citations.]" (*Western States, supra*, at pp. 566–567.)

The *Western States* court specifically rejected the argument that review could be had under section 21168 whenever an agency was required by law to hold a hearing on a matter. (*Western States, supra*, 9 Cal.4th at p. 567.) Instead, the *Western States* court made clear that review under section 21168 is proper *only* when an agency acted in a quasi-adjudicatory capacity, reasoning in part:

> "When the Legislature drafted . . . section 21168 in 1972, it borrowed the words, 'made as [a] result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in [a public agency],' from Code of Civil Procedure section 1094.5, subdivision (a). It was well established in 1972 that an administrative mandamus action under Code of Civil Procedure section 1094.5 was not the proper vehicle to challenge a quasi-legislative administrative decision even if the agency was required by law to hold a hearing as part of its rulemaking procedures. [Citation.] We assume that when the Legislature chose to incorporate the language of Code of Civil Procedure section 1094.5 into . . . section 21168, it intended that language to have the same meaning and be construed and applied in the same way as the courts had done up to that point. [Citation.]" (*Western States, supra*, at p. 568.)

Thus, under *Western States*, a local agency's certification of an EIR is quasi-legislative, unless the underlying action that the public agency analyzed in the EIR is quasi-adjudicative. (See Cal. Administrative Mandamus (3d ed. Cal CEB) Administrative Mandamus, § 5.19 [describing as "quasi-legislative and hence subject to review under [Code of Civil Procedure section] 1085," a "[CEQA] decision, such as certification of an EIR, when the

69

underlying decision is quasi-legislative, such as adoption of an ordinance, rule, regulation, or policy," citing *Western States, supra*, 9 Cal.4th at p. 566].)

In *Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48 (*Madera*), the Court of Appeal concluded that a plaintiffs' petition for writ of mandate challenging a local agency's certification of an EIR challenged a quasi-*legislative* action:

> "The acts of County's board of supervisors in (1) certifying the final EIR and (2) approving an ordinance that adopted the Tesoro Viejo specific plan and related rezoning constituted legislative and quasi-legislative decisions. In *Yost v. Thomas* (1984) 36 Cal.3d 561 [(*Yost*)], the California Supreme Court stated that it had 'no doubt' that 'the adoption of a specific plan is to be characterized as a legislative act.' (*Id.* at p. 570.) It also stated that 'the rezoning of land is a legislative act . . . .' (*Ibid.*)" (*Id.* at p. 75.)

The *Madera* court continued:

> "In this case, plaintiffs' petition for a writ of mandamus is properly classified as a petition for traditional mandamus (1) subject to the procedures set forth in Code of Civil Procedure section 1085 and (2) reviewed under the standards contained in . . . section 21168.5. [Citation.] This conclusion is not controversial, as a vast majority of proceedings challenging agency action for violating CEQA are treated as traditional mandamus reviewed under section 21168.5." (*Madera, supra*, 199 Cal.App.4th at p. 76.)

Similarly, in *Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, the Court of Appeal stated that a challenge to the certification of an EIR containing a particular mitigation measure was "as one for a writ of traditional mandamus under section 21168.5," because "the challenged agency decision is legislative in character." (*Id.* at p. 365, fn. 5.)

70

c.  *Relevant law with respect to whether the underlying actions analyzed in the FEIR are quasi-legislative or quasi-adjudicatory*

The FEIR analyzed two underlying actions to be taken by the City: (1) the approval of the building of the road and; (2) the amendment of planning documents to show the proposed roadway.[42]

i.  *An agency's decision to approve the building of a road is a quasi-legislative act*

In *Save Lafayette Trees v. East Bay Regional Park Dist.* (2021) 66 Cal.App.5th 21, 52–56 (*Save Lafayette Trees*) the Court of Appeal provided an extensive discussion of the distinction between land use decisions that are legislative in nature and those that are adjudicative. The *Save Lafayette Trees* court noted that, where an agency has to consider "a broad spectrum of community costs and benefits which cannot be limited to 'facts peculiar to the individual case,' " the agency acts in a legislative manner. (*Save Lafayette Trees, supra*, at p. 56; quoting *Oceanside Marina Towers Assn. v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735 (*Oceanside Marina*

---

[42]  The FEIR's "Project Description," stated in relevant part:

"The proposed [P]roject consists of construction and operation of a four-lane major street . . . . [¶] The proposed [P]roject would require an amendment to the Serra Mesa Community Plan."

The FEIR also indicated that, although it was "reasonably foreseeable that the roadway could be proposed and implemented without further discretionary review if the proposed [P]roject were to be approved and this [FEIR] were to be certified," the City was not "at this time," "proposing to construct or fund the roadway construction." (Underscore omitted.) The FEIR stated that the City was "only . . . analyz[ing] the environmental effects of [the road's] construction and operation, as directed by the City Council," and that, "[t]he [Civita] developer or another entity could implement the proposed [P]roject." (Underscore omitted.)

*Towers*) [concluding that agencies' CEQA decision pertaining to relocation of railroad switchyard was legislative in nature because "like any other decision regarding the location of a public improvement," (*id.* at p. 747) the agencies were required to consider numerous interests in selecting location, and "[a]lthough these types of decisions have substantial impact on surrounding properties, they have consistently been held to be 'legislative' acts exempt from due process hearing requirements" (*id.* at p. 745)].)

Among the cases cited by the *Save Lafayette Trees* court is *Quinchard v. Board of Trustees* (1896) 113 Cal. 664, 669 (*Quinchard*), in which the California Supreme Court concluded that "[w]hether an existing street shall be improved," was a legislative question, reasoning:

> "Whether an existing street shall be improved, is a question to be addressed to the governing body of a municipality in its legislative capacity, and its determination upon that question, as well as upon the character of the improvement to be made, is a legislative act. [Citations.] The act does not cease to be legislative because the members of the city council are required to exercise their judgment in determining whether the improvement shall be made. The judgment which they exercise in ordering the improvement is not a determination of the rights of an individual under existing laws, but is the conclusion or opinion which they form in the exercise of the discretionary power that has been [e]ntrusted to them, and upon a consideration of the public welfare and demands for which they are to provide."

*Quinchard* is consistent with other California Supreme Court case law stating that a governmental decision to approve road construction is legislative in nature. (See *Brown v. Board of Supervisors* (1899) 124 Cal. 274, 277–278 ["The act of the board of supervisors in determining whether a street shall be opened or closed, or widened or contracted, or otherwise improved, is a legislative act performed in the exercise of the power which has been

72

conferred upon the municipality by the legislature to enable it to provide for the welfare of its citizens"]; accord *Wheelright v. County of Marin* (1970) 2 Cal.3d 448, 452, 458 [concluding that an ordinance approving "a precise development plan for the construction of the Tennessee Valley access road," was a legislative act because "[r]oadways are of sufficient public interest and concern to weight the scales in favor of construing this ordinance as being legislative"].)

> ### ii. An agency's amendment of planning documents is a quasi-legislative act

An agency's act in adopting or amending a general or specific plan is a legislative act. (*Yost, supra*, 36 Cal.3d 561.) In reaching this conclusion, the *Yost* court reasoned in part:

> "The adoption of a general plan is a legislative act [Citation] 'The amendment of a legislative act is itself a legislative act' [citation] and the amendment of a general plan is thus a legislative act . . . . [Citation.] Therefore, the amendments to [city's] general plan were legislative acts . . . . [¶] This leaves the question whether the adoption of a specific plan is to be characterized as a legislative act. We have no doubt that the answer is affirmative. Certainly[,] such action is neither administrative nor adjudicative. [Citations.] On the other hand the elements of a specific plan are similar to those found in general plans or in zoning regulations—the siting of buildings, uses and roadways; height, bulk and setback limitations; population and building densities; open space allocation. [Citation.] The statutory procedure for the adoption and amendment of specific plans is substantially similar to that for general plans [citation]. It appears therefore that the legislative aspects of a specific plan are similar to those of general plans." (*Id.* at p. 570.)

In *Sierra Club v. Gilroy City Council* (1990) 222 Cal.App.3d 30, the Court of Appeal applied *Yost* in concluding that, because "[t]he amendment of

73

a general plan has been held to be a quasi-legislative action," judicial review of a CEQA decision pertaining to such action, "is governed by section 21168.5." (*Sierra Club v. Gilroy City Council, supra*, at p. 39.)

### 3. *Application*

In order to determine whether the City's certification of the FEIR and its approval of amendments to the SMCP and City's General Plan were quasi-adjudicatory acts, and thus subject to procedural due process requirements as Save Civita maintains, we must consider the nature of the acts undertaken by the City. (See *Western States, supra*, 9 Cal.4th at pp. 566–567 [stating that whether a petition challenging an agency's action for failing to comply with CEQA sounds in traditional or administrative mandate is determined by whether the agency's action was quasi-adjudicative or quasi-legislative]; *Save Lafayette Trees, supra*, 66 Cal.App.5th at p. 52 [in determining whether party could properly allege procedural due process claim against agency, Court of Appeal evaluated whether agency's action was quasi-adjudicatory]).

### a. *The City's approval of amendments to the SMCP and City's General Plan*

Considering the latter issue first, it appears clear that the City's approval of amendments to the SMCP and City's General Plan are quasi-legislative actions, because such actions "involve the adoption of rules of general application on the basis of broad public policy." (*Beck Development Co., supra*, 44 Cal.App.4th at p. 1188.) Indeed, as noted, the California Supreme Court has concluded that a governmental entity's action in adopting or amending a general or specific plan is clearly a legislative act (*Yost, supra*, 36 Cal.3d at pp. 570–571; see also, e.g., *The Park at Cross Creek, LLC v. City of Malibu* (2017) 12 Cal.App.5th 1196, 1204 ["A city's or county's adoption of

74

a general plan for its physical development is a legislative act. [Citations.] Adoption or amendment of a specific plan for the systematic implementation of the general plan is also a legislative act"].)

In its supplemental brief, Save Civita cites *Rural Landowners Assn. v. City Council* (1983) 143 Cal.App.3d 1013, 1018, footnote 4 (*Rural Landowners*) and *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1390, footnote 5 (*Friends of the Old Trees*), in support of its contention that the City's approval of amendments to the SMCP and City's General Plan were quasi-adjudicatory because provisions of City and state law require public hearings before the adoption of such amendments. Neither case supports Save Civita's position.

In *Rural Landowners, supra*, 143 Cal.App.3d at page 1018, footnote 4, the Court of Appeal stated, without analysis, that judicial review was governed by the administrative mandamus procedures of section 21168 because "[t]he actions under consideration by the City (general plan amendment, prezoning, tentative map approval) required public hearings." However, subsequent to the decision in *Rural Landowners*, as explained in part III.C.2.b.ii, *ante*, in *Western States*, the Supreme Court specifically rejected the notion that section 21168 applies *whenever* an agency is required by law to hold a hearing. (*Western States, supra*, 9 Cal.4th at p. 567 [explaining that the view that section 21168 applies whenever an agency is required to hold a hearing was incorrect as a matter of statutory interpretation].) Thus, even assuming that Save Civita is correct that the City was required to hold a hearing before adopting the amendments,[43] this

_____

[43] Save Civita cites to provisions of the San Diego Municipal Code, a City policy manual, and provisions of the Government Code in support of the proposition that "all plan amendments are *required* to be brought to a public hearing." (Boldface omitted.) However, Save Civita fails to demonstrate that

fact does not demonstrate that the City's action was quasi-adjudicatory. Thus, to the extent that *Rural Landowners, supra*, at page 1018, footnote 4 suggests that a general plan amendment is reviewable pursuant to section 21168 because an agency is required by law to hold a hearing, it is no longer good law in the wake of *Western States*. (See Kostka & Zischke, Practice Under the California Environmental Quality Act, *supra*, § 23.44 [stating that "*Western States* implicitly overrules" decisions such as *Rural Landowners, supra*, at p. 1018, footnote 4, in which courts have concluded that section 21168 applied because the agency held a hearing mandated by law].)

 *Rural Landowners* also was decided before *Yost, supra*, 36 Cal.3d 561 in which the Supreme Court expressly held that it had "no doubt," that the "adoption of a specific plan is to be characterized as a legislative act." (*Id.* at p. 570.) While Save Civita notes that the *Yost* court did not apply this conclusion in determining whether general plan amendments are reviewable by way of traditional mandamus under section 1085, *Yost* has been applied in such a fashion. For example, in *Cormier v. County of San Luis Obispo* (1984) 161 Cal.App.3d 850, 855, the Court of Appeal stated:

> "The actions of the legislative body in enacting zoning regulations are generally held to be legislative. For instance, a city council acts in a legislative capacity when it adopts a General Plan Amendment. This includes an amendment to a general plan. (*Yost*[, *supra*,] 36 Cal.3d

---

any of the public hearings referenced in these provisions are *adjudicative* hearings under *Western States*. (See *Western States, supra*, 9 Cal.4th at p. 567 [stating that "administrative mandamus is the 'procedure used to obtain judicial review of adjudicative decisions (i.e., decisions that determine what the facts are in relation to specific private rights or interests),' " and noting that administrative mandamus is not the proper method to challenge "a quasi-legislative administrative decision *even if the agency was required by law to hold a hearing as part of its rulemaking procedures*" (*id.* at p. 568, italics added)].)

561.)  This action is reviewable under Code of Civil Procedure section 1085."

Other courts have also applied *Yost* in determining that a CEQA action that involves a challenge to the adoption of a general plan sounds in traditional mandate.  (See, e.g., *Sierra Club v. Gilroy City Council, supra*, 222 Cal.App.3d at p. 39.)

Save Civita also cites *Friends of the Old Trees, supra*, 52 Cal.App.4th 1383, in support of Save Civita's contention that "[c]onsideration of the community-plan amendment in this case is . . . a quasi-judicial function that requires a hearing, evidence, and the exercise of discretion."  In *Friends of the Old Trees, supra*, the court noted that section 4582.7, subdivision (c), requires a public hearing with respect to administrative appeals of certain timber harvest plans.  (*Friends of the Old Trees*, at p. 1390, fn. 5.)  The *Friends of the Old Trees* court stated further that, "in such a scenario, the hearing requirement of section 21168 is clearly met" and judicial review is by way of administrative mandamus.  (*Ibid.*)  However, Save Civita fails to present any argument as to the ways in which a timber harvest plan administrative appeal is similar to a hearing pertaining to the adoption of a general plan amendment.  Further, as explained above, in the wake of *Western States*, even assuming that the City's adoption of a general plan amendment required a public hearing, this fact is clearly not a sufficient basis to warrant review by way of administrative mandamus.[44]

---

[44]    We also reject Save Civita's argument that the City's adoption of the plan amendments was adjudicatory because "although the proposed amendment was to a community plan, which is typically a broadly applicable policy document, the amendment referred to one specific project only—the road connection."  As explained in connection with our analysis whether the City's certification of the FEIR was quasi-legislative or quasi-adjudicative, *post*, in approving the building of the road, the City Council was acting in a

In sum, following *Yost*, we conclude that the enactment of a plan amendment involves the quasi-legislative act of adopting a rule of general application. Thus, we conclude that the City acted in a quasi-legislative capacity in approving amendments to the SMCP and City's General Plan.

b. *The City's certification of the FEIR*

In order to determine whether the City's certification of the FEIR was "quasi-legislative" or "quasi-adjudicative," we look to the nature of the underlying action that the City was analyzing in the FEIR. (See *Western States, supra*, 9 Cal.4th at p. 566; *Madera, supra*, 199 Cal.App.4th at p.76; Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, (Cont.Ed.Bar. 2021) Is Review Governed by Pub Res C §21168 or §21168.5?, § 23.41(c) [explaining that under *Western States*, "When an agency's decision on the merits of a project is reviewable [as a quasi-adjudicative act] under [Code of Civil Procedure section] 1094.5, [section] 21168 governs review of the related CEQA determination," but that "when the agency's decision on the merits of a project is reviewable [as a quasi-legislative act] under [Code of Civil Procedure section] 1085, [section] 21168.5 governs review of the related CEQA determination"].) In applying the *Western States* framework in this case, as discussed in part III.C.2.c, *ante*, the FEIR analyzed two underlying actions to be taken by the City: (1) approval of the building of the road and; (2) amendment of planning documents to show the proposed roadway. The administrative record makes clear that, in approving the building of the road, the City Council was not "limited to a consideration of the interests of nearby property owners." (*Save Lafayette Trees, supra*, 66 Cal.App.5th 21.) Moreover, in considering the "location of a public improvement" (*Oceanside*

---

legislative capacity in broadly considering the interest of the public generally and was not "limited to a consideration of the interests of nearby property owners." (*Save Lafayette Trees, supra*, 66 Cal.App.5th at p. 55.)

*Marina Towers, supra*, 187 Cal.App.3d at p. 747), the City Council had to assess "a broad spectrum of community costs and benefits . . . [that are not] limited to 'facts peculiar to the individual case.' " (*Ibid.*) Thus, consistent with the case law discussed in part III C.2.c.i, *ante* (see, e.g., *Quinchard, supra*, 113 Cal. at pp. 669–670 ["[w]hether an existing street shall be improved . . . is a question to be addressed to the governing body of a municipality in its legislative capacity"]), we conclude that the City's act in approving the building of the road was a quasi-legislative act. In addition, for the reasons stated *ante*, it is clear that the City's acts in amending planning documents to show the proposed roadway were quasi-legislative. Because both of the underlying acts analyzed in the FEIR are quasi-legislative, we conclude that the City's act in certifying the FEIR was also quasi-legislative.

Rather than apply the *Western States* framework and analyze the nature of the underlying actions evaluated in the FEIR, Save Civita broadly argues that "[w]here the agency's CEQA determination requires it to make findings, . . . section 21168 applies." (Citing *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 729; *CalBeach Advocates v. City of Solana Beach* (2002) 103 Cal.App.4th 529, 539.) Neither case holds that section 21168 applies whenever an agency is required to make findings. Rather, both cases merely state the proposition that " '[s]ection 21168 requires the agency make findings supporting its decision . . . .' " (*CalBeach Advocates v. City of Solana Beach, supra*, at p. 539; quoting *Association for Protection etc. v. City of Ukiah, supra*, at p. 729.)

We are not persuaded by Save Civita's contention that "the Legislature intended the CEQA process for the certification of [EIRs] to be quasi-adjudicatory in nature." Save Civita's suggestion that the certification of *any*

EIR is a quasi-adjudicative act is contrary to numerous cases holding that a CEQA petition challenging an EIR was quasi-*legislative* and/or reviewable under section 21168.5.  (See *Madera, supra*, 199 Cal.App.4th at p. 76; *Citizens Opposing a Dangerous Environment v. County of Kern, supra,* 228 Cal.App.4th 360; *Preservation Action Council, supra*, 141 Cal.App.4th at p. 1352; Cal. Administrative Mandamus, *supra*, Administrative Mandamus, § 5.19; cf. *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5 ["The parties dispute whether the Association's challenge to the Regents' certification of the [EIR] and approval of the project was a traditional or administrative mandamus proceeding. . . . This action appears to be one of traditional mandamus because the agency did not conduct a hearing at which evidence was taken in a judicial (adjudicative) sense, but we need not decide this issue"].)

Save Civita's contention that the certification of an EIR is, by default, quasi-adjudicatory and therefore reviewable under section 21168 is also contrary to the *Western States* framework for determining whether section 21168 or 21168.5 applies.  (See *Western States, supra*, 9 Cal.4th at pp. 566–567 [whether a CEQA petition is reviewable under section 21168 or 21168.5 is driven by an analysis of the nature of the agency's actions on the merits of a project].)

In sum, we reject Save Civita's argument that "the CEQA process pulls this Project into the quasi-adjudicatory realm."  Instead, applying the *Western States* framework, we conclude that the City's certification of the FEIR was a quasi-legislative act.

c. *Save Civita's procedural due process claim is foreclosed by our conclusions that the City was acting in a quasi-legislative capacity*

Our conclusions that the City was acting in a quasi-legislative capacity in certifying the FEIR and approving the amendments to the SMCP and City's General Plan forecloses Save Civita's procedural due process claim. (See, e.g., *Beck Development Co., supra*, 44 Cal.App.4th at p. 1188.)

Accordingly, we conclude that Save Civita is not entitled to reversal on the ground that the City violated the public's right to a fair hearing based on evidence that a City Council Member's staff solicited support for the Project.[45]

IV.

DISPOSITION

The judgment is affirmed.

AARON, Acting P. J.

WE CONCUR:

DATO, J.

GUERRERO, J.

---

[45] We also reject Save Civita's contention, raised in its supplemental brief, that "[e]ven if the City's decisions were quasi-*legislative* in nature, Save Civita's procedural due process claim would not be foreclosed because procedural unfairness is actionable under either section 1085 or section 1094.5." Save Civita has not cited, and our research has not uncovered, any case law supporting the proposition that it is improper for a legislator or his staff to seek public support for a project when the legislator is acting in a *quasi-legislative* capacity. Thus, Save Civita has not identified any procedural unfairness on which its petition for writ of mandate may challenge.

**Appendix A:**



**(FEIR, Figure 5.2-1, "Traffic Impact Study Area")**